**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Charles Walen and Paul Henderson, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Doug Burgum, in his official capacity as | ) | |
| Governor of the State of North Dakota, and | ) | |
| Alvin Jaeger, in his official capacity as | ) | **ORDER DENYING MOTION FOR** |
| Secretary of State of the State of North Dakota, | ) | **PRELIMINARY INJUNCTION** |
| | ) | |
| Defendants, | ) | Case No. 1:22-cv-31 |
| | ) | |
| and | ) | |
| | ) | |
| The Mandan, Hidatsa and Arikara Nation, | ) | |
| Lisa DeVille, and Cesar Alvarez, Jr., | ) | |
| | ) | |
| Defendants-Intervenors. | ) | |

Before ERICKSON, Circuit Judge, WELTE, Chief District Judge, and HOVLAND, District Judge.

PER CURIAM.

Plaintiffs Charles Walen and Paul Henderson challenge the subdivision of two North Dakota legislative districts, claiming the districts were the result of unconstitutional racial gerrymandering. They move for a preliminary injunction to eliminate the subdistrict lines for the 2022 primary and general elections. On the limited record before us at this early stage, we cannot say the Plaintiffs are likely to prove that race was the predominant factor driving the Legislative Assembly's decision. Nor do the Plaintiffs overcome the strong presumption that federal courts should avoid altering state election laws as voting draws near. We therefore deny the motion for preliminary injunction.

I.      **BACKGROUND**

The North Dakota Constitution directs the Legislative Assembly to redraw legislative district boundaries after every decennial census.  N.D. Const. art. IV, § 2.  Each district must be represented by one senator and two representatives.  Id.  A reapportionment plan "may provide for the election of senators at large and representatives at large or from subdistricts from those districts."  Id.; N.D. Cent. Code § 54-03-01.5(2).  Since 2001, the ratified plans have divided the state into 47 legislative districts, with one senator and two representatives elected at large from each district.  See Doc. No. 21-1, pp. 13-14.

The 2020 census triggered North Dakota's most recent redistricting process.  In the closing days of the last regular legislative session, Governor Burgum signed House Bill 1397 into law.  Doc. No. 19-1.  The bill established an interim Redistricting Committee tasked with creating "a legislative redistricting plan to be implemented in time for use in the 2022 primary election."  Id.  As guidance, the bill instructed that any proposed plan "must be of compact and contiguous territory and conform to all constitutional requirements with respect to population equality."  Id.  It additionally permitted consideration of other "constitutionally recognized redistricting guidelines and principles."  Id.

The Census Bureau released redistricting data to the states on August 12, 2021—more than four months past the statutory deadline.  See 13 U.S.C. § 141(c).  The Redistricting Committee held its initial meeting in late July 2021 and began substantive meetings two weeks after the census data arrived.  Doc. Nos. 20-1, 20-2.  Following a series of public meetings, the Redistricting Committee submitted a reapportionment plan for the Legislative Assembly to consider on September 29, 2021.  Doc. No. 20-19.  In a special session, the Legislative Assembly adopted the Redistricting Committee plan, embodied in House Bill 1504, without change.  Doc. No. 19-3.  The new district maps became law on November 12, 2021.  Id.

The enacted plan retains the election of one senator and two representatives at large in 45 of 47 districts.  Doc. No. 12-1.  Districts 4 and 9 are different.  Those districts continue to elect senators at large but will choose representatives from single-member subdistricts, labelled as House Districts 4A, 4B, 9A, and 9B.  Id.  In practical effect, subdistrict residents will vote for a single representative, while everyone else will vote for two.  House District 4A is coextensive with the boundaries of the Fort Berthold Indian Reservation.  Doc. No. 19-3, p. 2.  House District 9A substantially follows the borders of the Turtle Mountain Indian Reservation.  Id. at 4.

The 2022 election cycle is already underway.  The primary election will take place on June 14, and the general election is set for November 8.  Doc. No. 19, pp. 6-7.  To appear on the primary ballot, legislative candidates had to submit either a certificate of endorsement from a district political party or a valid nominating petition to Secretary Jaeger's office no later than April 11.  N.D. Cent. Code § 16.1-11-06(1).  Military and overseas ballots started going out on April 29.  N.D. Cent. Code § 16.1-07-23.  And county auditors began sending absentee ballots to all voters who requested them on May 5.  N.D. Cent. Code § 16.1-07-04.  Redistricting compelled some district political parties to reorganize and each county commission to draw new precinct boundaries.  Doc. No. 19, pp. 3-4.

The Plaintiffs, as residents and voters in Districts 4 and 9, initiated this action on February 16, 2022.  Doc. No. 1.[1]  Two weeks later, they moved for a preliminary injunction.  Doc. No. 9.  The motion contends that the subdivision of Districts 4 and 9 constitutes racial gerrymandering and thus violates the Equal Protection Clause of the Fourteenth Amendment.  Doc. No. 12.  This three-judge

---

[1] The Defendants briefly dispute standing, pointing out that neither Plaintiff has proven his residence in a challenged district.  But general factual allegations in a complaint suffice for standing to pursue a preliminary injunction.  Jones v. Jegley, 947 F.3d 1100, 1103-04 (8th Cir. 2020).  Allegations that Walen and Henderson respectively live in Districts 4 and 9 and intend to vote in future elections are enough for now.

district court convened under 28 U.S.C. § 2284(a).  Doc. No. 15.  After briefing concluded, we held

a hearing on the preliminary injunction motion on May 5, 2022.  Doc. No. 36.

## II.  DISCUSSION

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v.

Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  We evaluate four factors when considering a

motion for preliminary injunction: "(1) the threat of irreparable harm to the movant; (2) the state of

balance between this harm and the injury that granting the injunction will inflict on other parties

litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest."

Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc).  The balance of

harms and public interest factors merge when the government is the opposing party.  See Nken v.

Holder, 556 U.S. 418, 435 (2009).  Although usually no one factor is dispositive, a movant seeking

to enjoin the enforcement of a duly enacted state statute must establish likely success on the merits.

Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 732 (8th Cir. 2008) (en banc).

### A.    Likelihood of Success on the Merits

The Equal Protection Clause of the Fourteenth Amendment prohibits racial gerrymandering.

Cooper v. Harris, 137 S. Ct. 1455, 1463 (2017).  Without a sufficient justification, a state "may not

separate its citizens into different voting districts on the basis of race."  Miller v. Johnson, 515 U.S.

900, 911 (1995).  Racial gerrymandering claims require a two-step inquiry.  First, the plaintiff bears

the burden to establish "that race was the predominant factor motivating the legislature's decision

to place a significant number of voters within or without a particular district."  Bethune-Hill v. Va.

State Bd. of Elections, 137 S. Ct. 788, 797 (2017) (quoting Miller, 515 U.S. at 916).  Second, if race

was the predominant factor, then the burden shifts to the state to prove that the contested district is

narrowly tailored to a compelling governmental interest.  Shaw v. Reno, 509 U.S. 630, 643 (1993). We go no further than the first step here.

The Plaintiffs contend that the Legislative Assembly subdivided Districts 4 and 9 to dodge a lawsuit under § 2 of the Voting Rights Act of 1965 ("VRA") from Native Americans living on the Fort Berthold and Turtle Mountain Reservations.  They assert that House Districts 4A and 9A were intentionally drawn as majority-minority districts to provide Native Americans an equal opportunity "to participate in the political process and to elect representatives of their choice."  See 52 U.S.C. § 10301(b).  In response, the Defendants argue that traditional redistricting concepts like compactness, contiguity, and maintaining political subdivisions and communities of interest generally guided the decisionmaking.

As a foundational principle, "reapportionment is primarily the duty and responsibility of the State."  Chapman v. Meier, 420 U.S. 1, 27 (1975).  Federal judicial "review of districting legislation represents a serious intrusion on the most vital of local functions."  Miller, 515 U.S. at 915.  So we must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race."  Id. at 916.  "[T]he good faith of the state legislature must be presumed."  Abbott v. Perez, 138 S. Ct. 2305, 2324 (2018) (alteration and internal quotation omitted).

Not surprisingly, then, the evidentiary burden to prove that race predominated in legislative map-drawing is a "demanding one."  Easley v. Cromartie, 532 U.S. 234, 241 (2001) (quoting Miller, 515 U.S. at 928 (O'Connor, J., concurring)).  A plaintiff must show "that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations."  Miller, 515 U.S. at 916.  Doing so mandates either "circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose."  Id.

We begin with the circumstantial evidence.  The Plaintiffs highlight that House Districts 4A and 9A—as part of the only two subdivided districts in the state—largely mirror the borders of the Fort Berthold and Turtle Mountain Reservations and contain majority Native American populations. Those factors certainly imply that race played some role in what the Legislative Assembly did.  Even so, "[r]ace must not simply have been *a* motivation . . . but the *predominant* factor motivating the legislature's districting decision."  Easley, 532 U.S. at 241 (cleaned up).  The indirect evidence ends up ambiguous on that point.

To start, although not enough to dispel a racial motivation alone, the subdistricts are facially compact and contiguous.  See Bethune-Hill, 137 S. Ct. at 798.  Adherence to reservation boundaries also appears consistent with preserving "political subdivisions [and] communities defined by actual shared interests."  Miller, 515 U.S. at 916.  Training materials advised the Redistricting Committee members to consider both principles in their work.  Doc. No. 21-1, pp. 18, 41, 45, 87, 89.  Legislators received testimony from Native American leaders advocating for subdistricts under a community of interest standard for Turtle Mountain and Fort Berthold.  Doc. Nos. 20-3, 20-18, 20-21.  Important to remember, too, is that "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and territory."  United States v. Mazurie, 419 U.S. 544, 557 (1975) (citing Worcester v. Georgia, 31 U.S. 515, 557 (1832)); see also United States v. Cooley, 141 S. Ct. 1638, 1642 (2021) ("Long ago we described Indian tribes as distinct, independent political communities exercising sovereign authority." (internal quotation omitted)).  All this is to say that the demography and shapes of House Districts 4A and 9A are not plainly "unexplainable on grounds other than race." Shaw, 509 U.S. at 644 (quoting Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977)).

Turning to direct evidence of legislative purpose, the Plaintiffs offer a handful of statements from Redistricting Committee members and other legislators about the need to draw subdistricts to comply with the VRA. "[A]wareness of race does not mean that it predominated in the redistricting process." Harvell v. Blytheville Sch. Dist. No. 5, 126 F.3d 1038, 1041 (8th Cir. 1997) (citing Miller, 515 U.S. at 916). Predominance typically entails comparison. Predominant, n.1.b., Oxford English Dictionary Online, https://www.oed.com/view/Entry/149890 (last accessed May 26, 2022) ("[T]he main, most abundant, or strongest element; prevailing, preponderating."). What the record contains today are isolated comments from legislators during the reapportionment process that suggest race motivated the decision to subdivide two house districts. See Doc. No. 12, pp. 8-9.[2] We do not know whether those sentiments outweighed the other race-neutral criteria that lawmakers considered over more than 40 hours of committee hearings and floor debates. The testimony of Representative Terry Jones, standing alone, is insufficient to meet the "demanding" burden. See Easley, 532 U.S. at 241. He delivered only a legal conclusion that his colleagues subdivided the challenged districts because of race. Cf. Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 801 (8th Cir. 2004) (observing that courts should "disregard portions of various affidavits and depositions that . . . purport to state legal conclusions as fact" on summary judgment).

We acknowledge some evidence indicates that the Legislative Assembly drew the disputed subdistricts to stave off VRA litigation with Native Americans from the Fort Berthold and Turtle

---

[2] In addition to the statements of Senator Holmberg, Representative Headland, and Representative Monson referenced in the Plaintiffs' brief, we reviewed video at the hearing of floor debate remarks made by Senator Hogue, Representative Devlin, Representative Nathe, and Representative Schauer. We decline to take judicial notice of the entire legislative record at this time because even if we did, the burden would remain on the Plaintiffs to prove that race was the predominant factor. See Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 915 (8th Cir. 2007) (opining that a district court is not "obligated to wade through and search the entire record" for evidence to bolster a party's claim).

Mountain Reservations.  But the limited record before us cannot satisfy the difficult burden to prove that race predominantly motivated the subdivision of Districts 4 and 9.  At present, we conclude the Plaintiffs are not likely to prevail on the merits.  See Rounds, 530 F.3d at 732.

**B.      Irreparable Harm**

We also question whether the Plaintiffs have established a threat of irreparable harm.  To do so, they "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."  Roudachevski v. All-Am. Care Ctrs., Inc., 648 F.3d 701, 706 (8th Cir. 2011) (citation omitted).  Lack of irreparable harm "is an independently sufficient ground upon which to deny a preliminary injunction."  Grasso Enters., LLC v. Express Scripts, Inc., 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting Watkins Inc. v. Lewis, 346 F.3d 841, 844 (8th Cir. 2003)).

Racial gerrymandering normally causes harm: the practice "reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole."  Shaw, 509 U.S. at 650.  The Plaintiffs nowhere invoke that source of injury.  Instead, they claim harm through loss of their multimember house representation.  Yet North Dakota law specifically contemplates mixed multi- and single-member house districts.  N.D. Const. art. IV, § 2; N.D. Cent. Code § 54-03-01.5(2).  Further, the Supreme Court has tacitly endorsed reapportionment plans "for a bicameral legislature with one body composed of at least some multimember districts, as long as substantial equality of population per representative is maintained."  Chapman, 420 U.S. at 15 (citing Reynolds v. Sims, 377 U.S. 533, 577 (1964)).  The irreparable harm theory offered seems better suited to a "one person, one vote" claim than allegations of racially driven redistricting.  Compare, e.g., White v. Regester, 412 U.S. 755, 764 (1973) (characterizing the harm from a proportionality violation as "substantially dilut[ing] the weight of individual votes in the larger districts so as to deprive individuals in these

districts of fair and effective representation"), with Bush v. Vera, 517 U.S. 952, 980 (1996) (plurality opinion) (explaining that race-based districts "cause constitutional harm insofar as they convey the message that political identity is, or should be, predominantly racial"). We are unaware of authority recognizing the injury asserted here as grounds for injunctive relief against a racially gerrymandered district. As a result, we doubt whether the irreparable harm factor favors a preliminary injunction.

### C.   Balance of Harms and Public Interest

Even if the Plaintiffs were likely to win on the merits, "lower federal courts should ordinarily not alter the election rules on the eve of an election." Republican Nat'l Comm. v. Democratic Nat'l Comm., 140 S. Ct. 1205, 1207 (2020) (per curiam). With North Dakota's primary election less than three weeks away, we must account for factors "specific to election cases and [our] own institutional procedures." Purcell v. Gonzalez, 549 U.S. 1, 4 (2006) (per curiam). That is because federal court orders impacting elections may themselves result in uncertainty and hardship for voters, candidates, and election officials. See id. at 4-5. "As an election draws closer, that risk will increase." Id. at 5.

Instructive on the so-called Purcell principle is the Supreme Court's recent order in Merrill v. Milligan, 142 S. Ct. 879 (2022). There, the Court stayed a three-judge district court's preliminary injunction blocking Alabama's congressional district maps for a primary election set to commence via absentee voting seven weeks later. Id. at 879. Justice Kavanaugh wrote separately, suggesting that the bar on eleventh-hour election injunctions "might be overcome . . . if a plaintiff establishes at least the following": (1) "the underlying merits are entirely clearcut in favor of the plaintiff"; (2) "the plaintiff would suffer irreparable harm absent the injunction"; (3) "the plaintiff has not unduly delayed bringing the complaint to court"; and (4) "the changes in question are at least feasible before the election without significant cost, confusion, or hardship." Id. at 881 (Kavanaugh, J., concurring). Because the plaintiffs in that case fell short on two of the factors under "even such a relaxed version

of the Purcell principle," he believed a stay to be warranted.  Id.; see also Moore v. Harper, 142 S.

Ct. 1089, 1089 (2022) (Kavanaugh, J., concurring) (rejecting application for an injunction to change

North Carolina's congressional district maps over ten weeks before primary election because "[i]n

light of the Purcell principle and . . . timing of the impending primary elections in North Carolina,

it is too late for the federal courts to order that the district lines be changed for the 2022 primary and

general elections, just as it was too late for the federal courts to do so in the Alabama redistricting

case last month").  Following Merrill, two other district courts have denied preliminary injunctions

under the Purcell principle in redistricting cases for the 2022 election cycle.  Palmer v. Hobbs, 2022

WL 1102196, at *2-3 (W.D. Wash. Apr. 13, 2022) (August 2 primary with absentee voting starting

July 15); Alpha Phi Alpha Fraternity Inc. v. Raffensperger, --- F. Supp. 3d ----, 2022 WL 633312,

at *74-76 (N.D. Ga. Feb. 28, 2022) (May 24 primary with absentee voting starting April 5).

Justice Kavanaugh's framework provides helpful guidance for addressing the Purcell issue

here.  When applied, three problems emerge with the requested injunctive relief.  First, the evidence

that racial motivations predominated in the decision to subdivide Districts 4 and 9 is inadequate—

much less "entirely clearcut."  Second, irreparable harm is questionable at best.  Third, the proposed

remedy is unworkable without significant cost, confusion, and hardship.  Having earlier considered

the first two obstacles, we focus on the third.[3]

The Plaintiffs ask us to remove the subdistrict lines and order the Defendants to proceed with

at-large rather than single-member house elections.  But the immutable truth is that North Dakotans

have already started casting ballots for their legislators.  See N.D. Cent. Code §§ 16.1-07-04, 16.1-

07-23.  If seven weeks before absentee ballots went out was too close in Merrill, surely a change to

---

[3] We take no position on whether the Plaintiffs timely brought their complaint and ensuing motion for preliminary injunction.

legislative district boundaries after voting has actually begun would be too close now. Attempting to sidestep that reality, the Plaintiffs propose that election officials reprint new ballots for absentee voters in the disputed subdistricts along with notices directing them to revote, either for all the races or only the house contests. That seems to us an expensive and time-consuming solution. It is county election officials, not Secretary Jaeger, who print ballots. District 9 includes parts of three counties (Rolette, Towner, and Cavalier), and District 4 includes parts of six counties (Mercer, Dunn, Ward, Mountrail, McKenzie, and McLean). See Doc. No. 12-1. Exhausting the resources and employee hours of nine county auditors to reprint an unknown number of ballots in just weeks is impractical. Also noteworthy is that two house candidates in District 9 qualified for the ballot with nominating petitions based on signature thresholds applicable exclusively to the subdistricts. See Doc. No. 19-5. If we were to invalidate the subdistrict lines, those candidates would need approximately twice as many signatures to maintain ballot access for an at-large house election with no clear way to get them now that the deadline for petitions has passed. Most troubling, though, is the prospect of voter confusion. We would be hard pressed to think of a situation more confusing to a voter than receiving a second ballot with instructions to vote again. See, e.g., N.D. Cent. Code § 16.1-01-12(1)(c), (2)(b) (prohibiting voting more than once in any election as a felony). However clear the notice might be, some voters would likely remain unsure as to whether their initial vote counted. Equally uncertain is what election officials should do if a voter submits an original ballot but not a replacement.

Two additional complications merit mention. For one, the Plaintiffs portray their requested relief as necessary to "maintain the status quo." E.g., Tumey v. Mycroft AI, Inc., 27 F.4th 657, 664 (8th Cir. 2022) (describing "the primary function of a preliminary injunction as preserving the status quo until the district court has an opportunity to grant full effective relief"). Their argument omits the fact that Districts 4 and 9, even without the subdistrict lines, look different than they did during

the 2020 election cycle.  So we would not preserve the status quo, but instead bring about new house districts never authorized by the Legislative Assembly.  See Wise v. Lipscomb, 437 U.S. 535, 540 (1978) (stressing the importance in redistricting cases, "whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan").  For another, an order granting a preliminary injunction would be immediately appealable.  See 28 U.S.C. § 1253.  Possible reversal or stay of our decision would subject election officials and voters to whiplash from removal and swift reinstatement of the subdistrict lines.  See Purcell, 549 U.S. at 5 (directing courts to weigh the opportunity for appellate review).  In sum, the Purcell principle precludes us from enjoining the subdivision of Districts 4 and 9 for elections held this year.

The Plaintiffs' reliance on Wisconsin Legislature v. Wisconsin Elections Commission, 142 S. Ct. 1245 (2022) (per curiam), is misplaced.  In that case, the Wisconsin Supreme Court selected legislative maps in an original action after state government failed to enact a reapportionment plan. Id. at 1247.  The United States Supreme Court reversed for an Equal Protection violation, reasoning that "[s]ummarily correcting the error gives the [state] court sufficient time to adopt maps consistent with the timetable for Wisconsin's August 9th primary election."  Id. at 1248.  Whether the Purcell principle—which the opinion never mentioned—even applied there is a dubious proposition.  After all, the Court did not profess to "enjoin state election laws," Merrill, 142 S. Ct. at 879 (Kavanaugh, J., concurring), but rather mended a legal error in a judicial decision.  The timing is also far different. Wisconsin was given nearly five months to institute new maps before its primary, while we would afford North Dakota less than three weeks.  The danger of voter confusion and chaos for candidates and officials is too high this close to the election.

12

Likewise distinguishable is <u>Self Advocacy Solutions N.D. v. Jaeger</u>, 464 F. Supp. 3d 1039 (D.N.D. 2020), where Chief Judge Welte enjoined North Dakota's signature-matching law for mail-in ballots six days before the 2020 primary election.  The statutes challenged there facially violated procedural due process, making the merits "entirely clearcut."  <u>See</u> <u>id.</u> at 1054.  Voters faced serious harm from becoming "irreversibly disenfranchised for that election" if their ballot was rejected due to an erroneous signature mismatch determination.  <u>Id.</u>  And the remedy had no effect on the voting process itself; it merely required county election officials to contact at most a few dozen voters who had their signatures flagged—something already done for other ballot errors.  <u>Id.</u>  The <u>Self Advocacy</u> plaintiffs met each <u>Merrill</u> factor, whereas the Plaintiffs here falter on the merits, irreparable harm, and feasibility elements.

We also reject the Plaintiffs' invitation to discount the <u>Purcell</u> principle because of perceived delay in North Dakota's redistricting process.  From the moment the census data arrived until House Bill 1504 became law, exactly three months lapsed.  Indeed, Deputy Secretary of State Jim Silrum testified it was "a miracle" that the process finished on the same timeline as in years when population statistics released on schedule.  Holding a state legislature to a shorter window on pain of last-minute election changes from federal courts would unreasonably hamper a complex and delicate sovereign function.  As for the claim that the Defendants delayed this litigation, the Plaintiffs cannot complain about a briefing schedule to which they stipulated.  <u>See</u> Doc. No. 14.

Finally, a few words on the alternative remedy presented for the first time at the preliminary injunction hearing—special primary elections in August.  A district court called on to order a special election must weigh, at minimum, "the severity and nature of the particular constitutional violation, the extent of the likely disruption to the ordinary processes of governance if [special] elections are imposed, and the need to act with proper judicial restraint when intruding on state sovereignty."

<u>North Carolina v. Covington</u>, 137 S. Ct. 1624, 1626 (2017).  The Plaintiffs have not proven a likely constitutional violation.  In any event, freezing ongoing elections in Districts 4 and 9 to order new contests two months later would amount to an unprecedented intrusion into a state's wide-ranging authority to administer its own elections.  <u>See</u> <u>Tashjian v. Republican Party of Conn.</u>, 479 U.S. 208, 217 (1986) ("[T]he Constitution grants to the States a broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives,' Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices.").  We firmly decline to impose special elections.

## III.   <u>CONCLUSION</u>

We have reviewed the record, the parties' submissions, and the relevant legal authority.  For the reasons above, the motion for preliminary injunction (Doc. No. 9) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 26th day of May, 2022.

*/s/ Ralph R. Erickson*
Ralph R. Erickson, Circuit Judge
Eighth Circuit Court of Appeals

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court

WELTE, Chief District Judge, concurring.

I agree with the decision to deny the motion for a preliminary injunction. Given the timing of the upcoming primary and the fact that voting has already started, <u>Purcell</u> controls the decision. I write separately to note that the merits of this case appear to be, in my view, a close call, and I am

14

concerned about what the Legislative Assembly did (or did not) actually consider in creating the subdistricts at issue here.

/s/ Peter D. Welte
Peter D. Welte, Chief Judge
United States District Court