IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

Civil No: 1:22-CV-00031

| | | |
|---|---|---|
| Charles Walen, an individual; and Paul Henderson, an individual, | ) ) ) | |
| Plaintiffs | ) ) | |
| vs. | ) ) | |
| Doug Burgum, in his official capacity as Governor of the State of North Dakota; Michael Howe, in his official capacity as Secretary of the State of North Dakota, | ) ) ) ) ) | **DEFENDANTS DOUG BURGUM AND MICHAEL HOWE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| Defendants | ) ) | |
| and | ) ) | |
| The Mandan, Hidatsa and Arikara Nation; Lisa DeVille, an individual; and Cesareo Alvarez, Jr., an individual. | ) ) ) ) | |
| Defendants-Intervenors | ) | |

\*\*\*                         \*\*\*                         \*\*\*

## INTRODUCTION

Defendants[1] request the Court grant them summary judgment on Plaintiffs' lawsuit claims challenging certain State legislative Subdistricts that Plaintiffs contend were drawn impermissibly based on race in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. The challenged Subdistricts, encompassing parts of certain North Dakota Indian Reservations, were drawn and passed into law as part of North Dakota's Special

---

[1] Defendants Doug Burgum, in his official capacity as Governor of the State of North Dakota and Michael Howe, in his official capacity as Secretary of State of North Dakota ("Defendants") submit this memorandum in support of their *[] Motion for Summary Judgment*, filed herewith. Defendants request the Court dismiss the lawsuit claims of Plaintiffs' Charles Walen and Paul Henderson ("Plaintiffs") with prejudice pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 7.1.

Legislative Session in 2021, which followed the 2020 federal Decennial Census.  Despite Plaintiffs' claims, the undisputed facts and controlling law demonstrate Plaintiffs cannot prevail on their racial gerrymandering claims as they lack the necessary Article III standing to challenge one of the Subdistricts they contend was impermissibly drawn on the basis of race.  Because neither Plaintiff resides in that challenged Subdistrict, they cannot prove an "injury in fact" sufficient to invoke the necessary jurisdiction, and the controlling standard does not allow the federal courts to issue advisory opinions. Standing aside, Plaintiffs cannot succeed on their claims as to either of the challenged Subdistricts because the undisputed evidence shows race was not a predominant factor in legislative decision making, and even if it were a predominant factor, the Legislature had good reasons to believe a failure to subdistrict would be a violation of the Voting Rights Act ("VRA").  Compliance with the VRA is held by the U.S. Supreme Court to be a compelling governmental interest that withstands strict scrutiny. Moreover, Plaintiffs' remedy seeking elimination of the Subdistricts is not redressable as the remedy itself would violate the VRA.

Because there are no genuine issues of material fact on any of the essential elements of Plaintiffs' lawsuit claims and because Defendants are entitled to judgment as a matter of law, Defendants respectfully request the Court grant them summary judgment.

## PROCEDURAL HISTORY

Plaintiffs commenced this action on February 16, 2022, with the filing of their *Complaint For Declaratory And Injunctive Relief* ("Complaint"). (Doc. 1)[2]; s*ee also* Fed. R. Civ. P. 3. In their Complaint, Plaintiffs challenge the new legislative Subdistrict boundaries encompassing parts of two separate North Dakota Indian Reservations, which were created as part of House Bill 1504 by the N.D. Legislative Assembly, and signed by Governor Doug Burgum on November 11, 2021;

---

[2] References herein to materials contained on the Court's docket are to "(Doc. ___)".

House Bill 1504 became law when it was filed with the Secretary of State the next day. *See generally* (Doc. 1); Affidavit of Irwin James Narum (Jim) Silrum ("Silrum Aff.") ***Exhibit C*** (Doc. 19). Specifically, Plaintiffs challenge the creation of House Subdistricts 4B and 9A (collectively "Challenged Subdistricts"), which are located within the boundaries of Senate Districts 4 and 9, respectively. Complaint at ¶ 2. Plaintiffs allege the creation of the Challenged Subdistricts constitutes a racial gerrymander, allegedly in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Id.* at ¶¶ 44-51.

The Mandan, Hidatsa and Arikara Nation, Lisa DeVille, and Cesareo Alvarez, Jr. have intervened as Defendant-Intervenors in this lawsuit. (Doc. 17).

In addition to the Constitutional claims, Plaintiffs sought a preliminary injunction to enjoin Defendants from enforcing or giving effect to the Challenged Subdistricts. In this regard, on March 4, 2022, Plaintiffs filed their *Motion For Preliminary Injunction*, along with a supporting memorandum. (Docs. 9 & 12). Both Defendants and Intervenors submitted memoranda in opposition to Plaintiffs' preliminary injunction motion, (docs. 18 & 21) and Plaintiffs filed a reply memorandum. (Doc. 30). The Court scheduled and held an evidentiary hearing on the preliminary injunction motion on May 5, 2022 at which hearing the parties presented testimony and evidence to the Court. Clerk's Minutes (Doc. 36). Thereafter, the Court denied Plaintiffs preliminary injunction motion. *Order Denying Motion for Preliminary Injunction*. (Doc. 37).

Defendants answered the Complaint on April 22, 2022, denying Plaintiffs' claims had any factual or legal support and raising other defenses thereto. *Defendants' Answer*. (Doc. 32). The Intervenors also submitted an Answer in Intervention in which they denied Plaintiffs' lawsuit claims have merit. (Doc. 33). Defendants and Intervenors have disclosed expert witnesses along with expert reports, but Plaintiffs have not disclosed any expert witness or expert report as of the

November 15, 2022 deadline. Scheduling Order (Doc. 44).  The trial of this matter is scheduled for October 2-6, 2023.

**UNDISPUTED FACTS AND BACKGROUND**

**I.**     **LEGISLATIVE REDISTRICTING IN NORTH DAKOTA**

After a thorough legislative redistricting process following the 2020 U.S. Census, the N.D. Legislative Assembly ("Legislature") passed and the N.D. Governor signed into law House Bill 1504.  The new law created State legislative districts, including the districts and subdistricts challenged in this action:  House Subdistricts 4B and 9A (collectively "Challenged Subdistricts"). The Challenged Subdistricts are located within the boundaries of Senate Districts 4 and 9, respectively.  Plaintiffs allege the creation of the Challenged Subdistricts constitutes a racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment.

Legislative redistricting in N.D. is governed in part by the State Constitution.  Section 1, Article IV of the N.D. Constitution provides the "senate must be composed of not less than forty nor more than fifty-four members, and the house of representatives must be composed of not less than eighty nor more than one hundred eight members. These houses are jointly designated as the legislative assembly of the state of North Dakota."  Under Section 2, Article IV, the Legislative Assembly is required to "fix the number of senators and representatives and divide the state into as many senatorial districts of compact and contiguous territory as there are senators."  N.D. Const., Art. IV, Sec. 2.  The senatorial districts "continue until the adjournment of the first regular session after each federal decennial census, or until changed by law." *Id.* The Legislative Assembly is required to "guarantee, as nearly as is practicable, that every elector is equal to every other elector in the state in the power to cast ballots for legislative candidates."  *Id.* A senator and at least two representatives are apportioned to each senatorial district, however, Section 2, Article IV

4

expressly permits the creation of subdistricts for elections of members of the House of Representatives, as was done in this case in District 9.  *Id.*  In that regard, the N.D. Constitution states, "[a] senator and at least two representatives must be apportioned to each senatorial district and be elected at large or from subdistricts from those districts. The legislative assembly… may provide for the election of senators at large and representatives at large or from subdistricts from those districts." *Id.*

In addition to the state constitutional requirements, N.D. Century Code Section 54-03-01.5 states that legislative redistricting plans must meet the following requirements:

1. The senate must consist of forty-seven members and the house must consist of ninety-four members.
2. Except as provided in subsection 3, one senator and two representatives must be apportioned to each senatorial district. Representatives may be elected at large or from subdistricts.
3. [. . . .][3]
4. Legislative districts and subdistricts must be compact and of contiguous territory.
5. Legislative districts must be as nearly equal in population as is practicable. Population deviation from district to district must be kept at a minimum. The total population variance of all districts, and subdistricts if created, from the average district population may not exceed recognized constitutional limitations.

N.D.C.C. § 54-03-01.5.

## II.     2021 LEGISLATIVE REDISTRICTING PROCESS

### A.     *U.S. Census Data*

The United States Census Bureau ("Census Bureau") is required by Public Law 94-171, enacted by Congress in 1975, to provide redistricting data tabulations ("Public Law 94-171 data")

---

[3] North Dakota Century Code Section 54-03-01.5(3) and Article IV, Section 2 of the North Dakota Constitution allow two senatorial districts to be combined under certain circumstances, creating multimember senate districts with two senators and four representatives. However, these provisions are not at issue in the present case.

to state redistricting officers and bodies no later than one year from census day.  PL 94–171, December 23, 1975; 13 U.S.C § 141(c).  The Public Law 94-171 data from the Census Bureau is necessary for states to perform redistricting work.  Following the 2020 Census, the Public Law 94-171 data was required to be transmitted to the states by April 1, 2021.  *See* 13 U.S.C § 141(a) and (c).  However, on February 12, 2021, the Census Bureau announced that due to COVID-19 related delays and prioritizing the delivery of the apportionment results, the Public Law 94-171 data would not be available to the states by the April 1, 2021 deadline, but would be available by September 30, 2021.[4]  Despite the delay in receiving crucial data from the federal government, the State of N.D. moved quickly to begin and ultimately complete the necessary redistricting work, as discussed below.

### B.   *Legislative Committee Work*

On April 21, 2021, Governor Burgum signed House Bill 1397, which established a legislative management redistricting committee ("Redistricting Committee") that was required to develop and submit to the legislative management a redistricting plan and legislation to implement the plan.  Affidavit of Bradley N. Wiederholt ("Wiederholt Aff."), ***Exhibit 1***[5].

On July 29, 2021, in a public meeting, the members of the Redistricting Committee received training on the use of the state-procured mapping software called "Maptitude".  Wiederholt Aff., ***Exhibit 2***.  On August 12, 2021, the Census Bureau released the Public Law 94-

---

[4] https://www.census.gov/newsroom/press-releases/2021/statement-redistricting-data-timeline.html#:~:text=FEB.,30%2C%202021

[5] Various publicly available records whose "accuracy cannot reasonably be questioned" are attached to the Wiederholt Affidavit. For the Court's convenience, where applicable, a hyperlink to the public record on the North Dakota Legislative Assembly website is also provided in the Wiederholt Affidavit. The Court can and should take judicial notice of the publicly available materials attached to the Wiederholt Affidavit. Fed. R. Evid. 201(c) ("The court: [] (2) must take judicial notice if a party requests it and the court is supplied with the necessary information.").

171 data relating to the 2020 Census in a format that could be incorporated into Maptitude.[6] Caliper Corporation, the developer of the Maptitude software, finished incorporating the 2020 Public Law 94-171 data for N.D. into Maptitude on August 16, 2021.  *See id.*

In addition, another N.D. legislative committee held relevant public meetings relating to redistricting: the Tribal and State Relations Committee.  Pursuant to N.D.C.C. § 54-35-23(3), the Tribal and State Relations Committee conducts "joint meetings with the N.D. tribal governments' task force to study tribal-state issues, including government-to-government relations, human services, education, corrections, and issues related to the promotion of economic development." On August 17, 2021, the Tribal and State Relations Committee held a public meeting at Turtle Mountain Community College in Belcourt, N.D. on the Turtle Mountain Indian Reservation. Wiederholt Aff., ***Exhibit 3***.  At the meeting, Alysia LaCounte, General Counsel of Turtle Mountain Band of Chippewa Indians testified, and Nicole Donaghy, Executive Director of North Dakota Native Vote, provided written testimony.  Wiederholt Aff., ***Exhibit 3*** at p. 1, and ***Exhibit 4***.

On August 26, 2021, the Redistricting Committee held a public meeting at the State Capitol.  Wiederholt Aff., ***Exhibit 5***.  At the meeting, Ben Williams from the National Conference of State Legislatures provided a presentation regarding redistricting fundamentals, the 2020 Census, legal doctrines that govern redistricting, and redistricting criteria.  Wiederholt Aff., ***Exhibit 5*** at pp. 1-2 and ***Exhibit 6***.  Also at the meeting, Emily Thompson from the N.D. Legislative Council presented a background memorandum for the Redistricting Committee, laying out the background, history, and applicable state and federal law relating to redistricting. Wiederholt Aff., ***Exhibit 5*** at p. 2 and ***Exhibit 7***.  Emily Thompson also presented a visual

---

[6]  *See*  https://www.census.gov/newsroom/press-releases/2021/news-conference-2020-census-redistricting-data.html;  https://www.caliper.com/learning-redistricting/index.php/articles/when-will-i-receive-my-2020-redistricting-data/ (Wiederholt Aff., ***Exhibit 34***).

illustration of constitutional and statutory mapping requirements. Wiederholt Aff., *Exhibit 5* at p. 2 and *Exhibit 8*. Also at the August 26, 2021 meeting of the Redistricting Committee, written testimony was provided by Collette Brown (Gaming Commission Executive Director at the Spirit Lake Casino and Resort) (Wiederholt Aff., *Exhibit 5* at p. 2 and *Exhibit 9*), by Karen Ehrens (Secretary of the League of Women Voters of N.D.) (Wiederholt Aff., *Exhibit 5* at p. 2 and *Exhibit 10*), by Matt Perdue (on behalf of N.D. Farmers Union) (Wiederholt Aff., *Exhibit 5* at p. 2 and *Exhibit 11*), and by Rick Gion (Director of N.D. Voters First) (Wiederholt Aff., *Exhibit 5* at p. 2 and *Exhibit 12*).

On August 31, 2021, the Tribal and State Relations Committee held a public meeting at the MHA Nation Interpretive Center, located in New Town, N.D. on the Fort Berthold Indian Reservation. Wiederholt Aff., *Exhibit 13*. The Tribal and State Relations Committee held another public meeting on September 1, 2021 at the Spirit Lake Casino and Resort, located in St. Michael, N.D. on the Spirit Lake Nation Reservation. Wiederholt Aff., *Exhibit 14*.

On September 8, 2021, the Redistricting Committee held a public meeting in Fargo, N.D. Wiederholt Aff., *Exhibit 15*. On September 15 and 16, 2021, the Redistricting Committee held a two-day public meeting at the State Capitol. Wiederholt Aff., *Exhibit 16*. At the meeting, written testimony was provided by Nicole Donaghy (Executive Director N.D. Native Vote) (Wiederholt Aff., *Exhibit 16* at p. 2 and *Exhibit 17*), Collette Brown (Gaming Commission Executive Director at the Spirit Lake Casino and Resort) (Wiederholt Aff., *Exhibit 16* at p. 1 and *Exhibit 18*), Mike Faith (Chairman for the Standing Rock Sioux Tribe) (Wiederholt Aff., *Exhibit 16* at p. 1 and *Exhibit 19*), and Charles Walker (Councilman for the Standing Rock Sioux Tribe ) (Wiederholt Aff., *Exhibit 16* at p. 1 and *Exhibit 20*). Matthew Campbell, a staff attorney with the Native American Rights Fund also testified. *Exhibit 16* at p. 2.

On September 22 and 23, 2021, the Redistricting Committee held a two-day public meeting at the State Capitol.  Wiederholt Aff., ***Exhibit 21***.  At the meeting, attorney Claire Ness from the N.D. Legislative Council made a presentation on legal considerations for subdistricting. Wiederholt Aff., ***Exhibit 21*** at p. 1 and ***Exhibit 22***.  Also at the meeting, written testimony was provide by Mark Fox (Wiederholt Aff., ***Exhibit 21*** at p. 2 and ***Exhibit 23***), Chairman of the Tribal Business Council of the Mandan, Hidatsa and Arikara Nation ("MHA Nation").

On September 28 and 29, 2021, the Redistricting Committee held a two-day public meeting at the State Capitol.  Wiederholt Aff., ***Exhibit 24.***  At the meeting, written testimony was provided by Mike Faith (Chairman for the Standing Rock Sioux Tribe) (Wiederholt Aff., ***Exhibit 24*** at p. 4 and ***Exhibit 25***), Mark Fox (Chairman of the Tribal Business Council of the MHA Nation) (Wiederholt Aff., ***Exhibit 24*** at p. 4 and ***Exhibit 26***), Douglas Yankton (Sr., Chairman of the Spirit Lake Nation) (Wiederholt Aff., ***Exhibit 24*** at p. 4 and ***Exhibit 27***), and Lisa DeVille (member of the MHA Nation) (Wiederholt Aff., ***Exhibit 24*** at p. 3 and ***Exhibit 28***).  In relation to the meeting, attorney Claire Ness from the N.D. Legislative Council sent an email to the Redistricting Committee members, providing summaries of various court cases relating to Section 2 of the VRA. Wiederholt Aff., ***Exhibit 24*** at p. 4 and ***Exhibit 29***.

### C.    *Final Report Of The Redistricting Committee*

On November 1, 2021, as required by House Bill 1397, the Redistricting Committee submitted its final report regarding redistricting to the legislative management, with a recommendation to pass House Bill 1504, which included the descriptions of the proposed legislative districts.  Wiederholt Aff., ***Exhibit 30*** at pp. 19-30.  The final report noted the Redistricting Committee solicited and received testimony from multiple individuals representing

tribal interests, tribal nations, and Native American rights organizations. *Id.* at p. 29. That testimony:

- Noted the growth of Native American populations in N.D.;
- Urged the creation of subdistricts for Native American voters to comply with the federal VRA and prevent dilution of votes cast by Native Americans;
- Requested tribal members be considered communities of interest;
- Urged the committee to provide equitable, more direct, and more responsive representation for Native Americans;
- Urged the committee not to split reservations into multiple districts;
- Noted multiple Native American candidates have had unsuccessful campaigns for membership in the House;
- Asserted there has been a history of discrimination in N.D. against Native Americans; and
- Asserted a history of racial bloc voting has prevented Native American voters from electing their candidates of choice.

*Id.*

The Redistricting Committee's final report also notes it received updates from committee members on the Tribal and State Relations Committee, which received similar testimony. *Id.* The final report also indicates the Redistricting Committee reviewed the 2020 Census data for tribal reservations, including the total population, total voting-age population, American Indian population, and American Indian voting-age population for each of the five reservations in N.D. *Id.* Further, the final report notes the Redistricting Committee received information from the Legislative Council staff and testimony from others on constitutional and statutory provisions regarding the use of race in redistricting, including in relation to the 14th Amendment to the United States Constitution and the VRA, and applicable legal tests. *Id.*

The final report also notes that the Redistricting Committee members engaged in multiple discussions regarding subdistricts, including the subdistricts in Districts 4 and 9, with discussion

of whether to draw Subdistrict boundaries based on race, discussion of the ability of Subdistricts to prevent dilution of Native Americans' votes, discussion of a preference for legislatively drawn district boundaries over court-drawn boundaries that may result from litigation, and discussion of Subdistricts providing communities of interest with an opportunity to elect their candidates of choice. *Id.* at p. 30.

Ultimately, the Redistricting Committee recommended in its final report the passage of House Bill No. 1504 to establish 47 legislative districts, including subdistricts in Districts 4 and 9. *Id.*

### D.   Legislative Assembly Work

Governor Burgum issued Executive Order 2021-17, which convened a special session of the Legislative Assembly on November 8, 2021 to, among other things, "provide for redistricting of government pursuant to Article IV, Section 2, of the N.D. Constitution following the 2020 census". Wiederholt Aff., ***Exhibit 31***.   On November 8, 2021, a Joint Redistricting Committee held hearings on House Bill 1504.  Wiederholt Aff., ***Exhibit 32***. At the November 8, 2021 meeting, written testimony was submitted by Douglas Yankton, Sr. (Chairman of the Spirit Lake Nation) (*Id*. at pages pp. 17-24), Jamie Azure (Chairman of the Turtle Mountain Band of Chippewa Indians) (*Id*. at pp. 25-32), and Rick Gion on behalf of North Dakota Voters First (*Id.* at p. 33). On November 9, 2021, the House of Representatives debated and passed House Bill 1504 in a floor session. On November 10, 2021, the Senate debated and passed House Bill 1504.

### E.   Final Districts/Maps At Issue In This Case

House Bill 1504 was signed by Governor Burgum on November 11, 2021 and became law when filed with the Secretary of State the next day.  Doc. 19-1.  The district descriptions were codified as N.D.C.C. § 54-03-01.14 after technical corrections were made.

Maps of the final statewide redistricting recommended by the Redistricting Committee, and ultimately codified in law, are contained in the legislative record and the relevant maps are attached to the Wiederholt Aff. as *Exhibit 33*.  For the Court's convenience and reference, the Legislative Branch website also contains the approved maps for each district[7], as well as a static version[8] and interactive version[9] of the full statewide map.

At issue in this case are Senate Districts 4 and 9 (with their House Subdistricts 4A, 4B, 9A and 9B).  *See* Wiederholt Aff. as *Exhibit 33*.  One senator is elected at large from each of Senate Districts 4 and 9, totaling 2 Senators.  One member of the House is elected from each of House Subdistricts 4A and 9A and one member of the House is elected from each of House Subdistricts 4B and 9B, totaling 4 House members.

## PLAINTIFFS' LAWSUIT ALLEGATIONS

Plaintiffs' February 16, 2022 *Complaint for Declaratory and Injunctive Relief* (Doc. 1) includes the following allegations, among others:

> [1] This is an action for declaratory and injunctive relief against the implementation and use of the newly enacted legislative redistricting plan creating two new Subdistricts passed by the North Dakota Legislative Assembly and signed by Governor Doug Burgum on November 11, 2021.
> [2] At issue in this action is the Legislative Assembly's enactment of a new statewide legislative district map, which for the first time in North Dakota's history,

---

[7] Approved Legislative Redistricting Maps, H.B. 1504, 67th N.D. Legis. Spec. Sess. (Nov. 8, 2021), https://www.ndlegis.gov/assembly/67-2021/special/approved-legislative-redistricting-maps, (last visited Feb. 28, 2023) (Wiederholt Aff., Paragraph 37).

[8] North Dakota Redistricting Plan, H.B. 1504, 67th N.D. Legis. Spec. Sess. (Nov. 8, 2021), https://www.ndlegis.gov/files/district-maps/2023-2032/finalmaphb1504.pdf, (last visited Feb. 28, 2023) (Wiederholt Aff., *Exhibit 35*).

[9] Statewide Map, H.B. 1504, 67th N.D. Legis. Spec. Sess. (Nov. 8, 2021), https://ndgov.maps.arcgis.com/home/webmap/templates/OnePane/basicviewer/embed.html?webmap=abb67d432e9242c4800374ba87763c80&gcsextent=-101.40,47.50,-101.20,49.30&displayslider=true&displaydetails=true&displaysearch=true, (last visited Feb. 28, 2023) (Wiederholt Aff., *Exhibit 36*).

includes two Subdistricts located in Districts 4 and 9 respectively. The Subdistricts intentionally include the boundaries of the Forth Berthold and Turtle Mountain Indian Reservations.

[3] The Legislative Assembly created the Subdistricts solely on the basis of race and for the purported purpose of complying with the Voting Rights Act of 1965.

[4] The creation of Subdistricts in Districts 4 and 9 was racial gerrymandering for which race was the predominant factor.

[5] The Legislative Assembly made no statistical analysis or inquiry regarding voting history or racial voting patterns in Districts 4 and 9 that would justify the use of race as a predominant factor in its creation of the Subdistricts. Therefore, the Legislative Assembly did not have a compelling state interest for creating the Subdistricts.

[6] The Subdistricts cannot pass constitutional muster because they were drawn with race as the predominant factor and without a compelling justification or narrow tailoring.

[7] Plaintiffs seek a declaration that the challenged Subdistricts are invalid and an injunction prohibiting the Defendants from calling, holding, supervising, or taking any action with respect to legislative elections based on the challenged Subdistricts as they currently stand.

[. . . .]

[19] When redistricting a legislative map, if racial considerations predominated over other redistricting principles, the burden is on the state to demonstrate the design of the legislative district is narrowly tailored to serve a compelling state interest.  Id. at 1464.

[20]  Compliance with Section 2 of the Voting Rights Act of 1965 may be a compelling state interest which justifies the drawing of district boundaries on the basis of race. Alabama Legislative Black Caucus v. Alabama, 575 U.S. 254, 278 (2015).

[21] In order for a state to demonstrate a racial gerrymander is justified under Section 2 of the Voting Rights Act, it must demonstrate its decision to draw district boundaries based on race meets the preconditions set forth by the Court in Thornburg v. Gingles, 478 U.S. 30 (1986).

[22] In Gingles, the Court laid out three preconditions which are required to succeed on a Voting Rights Act§ 2 claim: (1) the minority Group must be sufficiently large and geographically compact to constitute a majority in some reasonably configured district; (2) the minority group must be politically cohesive; and (3) the district's white majority must vote sufficiently as a "bloc" to usually defeat the minority's preferred candidate. 478 U.S. at 50-51.

[23] If a state cannot demonstrate its racial gerrymandering meets the Gingles preconditions, the districts in question are not narrowly tailored to achieve a compelling state interest, and are thus a violation of the Fourteenth Amendment of the United States Constitution. Cooper, 137 S. Ct. at 1470;

[. . . .]

[40] Traditionally, the North Dakota House of Representatives consists of 94 members, with two Representatives being elected at-large in each district.

However, under the redistricting plan enacted by the Legislative Assembly, Districts 4 and 9 are now subdivided into Districts 4A and 4B, and 9A and 9B respectively. Under this plan, Representatives from Districts 4 and 9, are no longer elected at-large, but are instead elected only by citizens in their respective Subdistrict.

[41] The creation of these Subdistricts deprives the citizens of Districts 4 and 9 from multi-member representation in the House of Representatives, as each citizen is now only represented by a single Representative elected in the Subdistrict in which they reside. All other North Dakota citizens retain the benefit of multi-member representation in the House of Representatives.

[42] The creation of Subdistricts in Districts 4 and 9 is a racial gerrymander for which race was the predominant factor, and for which the Legislative Assembly had no compelling state interest.

[43] As a result of the Legislative Assembly's racial gerrymander, citizens of Districts 4 and 9 will be denied equal representation under the law, as they will only be represented by one State Representative, while all other North Dakota citizens will be represented by two State Representatives.

Complaint for Declaratory and Injunctive Relief (Doc. 1) at ¶¶ 1-7, 19-23, 40-43.

In line with their pleadings, during their depositions taken on December 7, 2022, Plaintiffs essentially testified their votes have been diluted because of the subdistricting in that they have only one representative and not two. Both Plaintiffs seek to eliminate Subdistricts 4A and 9B, which all of the experts agree and the evidence shows are composed of majority Native American voting age populations. Plaintiff Walen testified in relevant part as follows:

> Q.  So your objection [to the subdistricting of District 4] is that you have – you get to vote for one state representative rather than two state representatives. Is that correct?
> A   Correct. And now I'm not -- I'm not being represented by two, like I have been in the past. When the rest of the state gets two, I only get one.
> Q   So that's your complaint, that you think you should be able to have two representatives, not just one?
> A.  Yes, that is the complaint.
> Q.  Is there anything else about the redistricting plan that you object to?
> A.  No.
> Q   And the extent of the unequal treatment that you think the plan has is that you're represented by one person rather than two?
> A.  Correct.
> Q.  And that's the sole reason why you'd like to see the district change to be one full district?
> A.  Correct.

Q.  Would you also like to see the district be represented by two Republicans in the State House?

A. I would like that personally, yes.

Deposition of Charles Walen ("Walen Depo.") (Wiederholt Aff., ***Exhibit 37***) at 23: l. 4 – 24: l. 5.

Plaintiff Henderson testified in a similar manner, in relevant part as follows:

Q  And I think you explained it a little bit, but make sure I'm right.  Your concern is that you're unable to vote for two state representatives at large; but, rather, you vote for one that's dedicated to your subdistrict [9B].  Is that your concern?

A  That's correct.

Q  And in terms of, you know, you mentioned that you thought it was unconstitutional.  I gather that your complaint is that it's unequal for you to get one when other voters in the state get two representatives that they vote for. Is that correct?

A  Yeah.  I'm not a lawyer, but I know enough to know that that's my experience.

Q  And when you say you thought it was unconstitutional, is that the unequal treatment that you were concerned about?

A  Correct.

Q  Do you have any other objections or complaints about the redistricting plan?

A  I guess I don't.  I just -- that's what I'm basing my participation in, is that it's unconstitutional, in my view.

Q  And would you like to see the map changed?

A  I would like to have the opportunity to vote for two representatives, yeah.

Q  If that change made it harder for Republicans to win the district, would you like to see that?

A  It wouldn't matter.

Q  And aside from the fact that you cast your ballot for just one rather than two representatives, is there any other way in which you were affected by the way the map lines are drawn?

A  No.  I guess that would be the height of my complaint.

Deposition of Paul Henderson ("Henderson Depo.") (Wiederholt Aff., ***Exhibit 38***) at 28: l. 2 – 29:

l. 17.

## LAW AND ARGUMENT

## I.    SUMMARY JUDGMENT STANDARD

The Eighth Circuit Court of Appeals has explained the summary judgment standard as follows:

15

Summary judgment is appropriate only when the pleadings, depositions and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. The party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. Such a showing shifts to the non-movant the burden to go beyond the pleadings and present affirmative evidence showing that a genuine issue of material fact exists. The non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts. The non-movant "must show there is sufficient evidence to support a jury verdict in his favor. Factual disputes that are irrelevant or unnecessary will not be counted, and a mere scintilla of evidence supporting the non-movant's position will not fulfill the non-movant's burden.

*Uhiren v. Bristol-Meyers Squibb Company, Inc.*, 346 F.3d 824, 827 (8th Cir. 2003) (citations and quotations omitted).

## II.   <u>DISCUSSION & ANALYSIS</u>

### A.  *Plaintiffs Lack Article III Standing to Challenge Subdistrict 9B.*

In their *Complaint*, Plaintiffs assert a single cause of action for violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. However, both Plaintiffs Walen and Henderson lack the required standing to assert that cause of action as to the challenged House Subdistrict 9A, thus divesting the Court of jurisdiction to decide that claim.

To invoke federal jurisdiction, a party must establish the three elements of standing, namely: (1) the party must identify a concrete and particularized injury-in-fact that is actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *U.S. v. Hays*, 515 U.S. 737, 743 (1995); *see also Owner-Operator Independent Drivers Assoc., Inc. v. U.S. Dep't of Trans.*, 831 F.3d 961, 966 (8th Cir. 2016) (quotation omitted). The courts are not allowed to issue "advisory opinions". *Carney v. Adams*, 208 L. Ed. 2d 305, 141 S. Ct. 493, 498 (2020) (citing *Coleman* v. *Miller*, 307 U.S. 433, 460, 59 S.Ct. 972, 83 L.Ed. 1385 (1939) (opinion of Frankfurter, J.) ("[I]t was not for courts to

pass upon ... abstract, intellectual problems but only if a concrete, living contest between adversaries called for the arbitrament of law"); *Cross v. Fox*, 23 F.4th 797, 800 (8th Cir. 2022). The plaintiff "bears the burden of establishing standing as of the time" of the lawsuit and "maintaining it thereafter." *Carney*, 141 S.Ct. at 499 (citations omitted).

> It is well established that standing is a jurisdictional prerequisite that must be resolved before reaching the merits of a suit. *See, e.g., McCarney v. Ford Motor Co.,* 657 F.2d 230, 233 (8th Cir.1981). We have stated numerous times that "standing is a 'threshold inquiry' that 'eschews evaluation on the merits.' " *Id.* (quoting *Coal. for the Env't v. Volpe,* 504 F.2d 156, 168 (8th Cir.1974)).

*City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007) (citations and quotations in original).

The U.S. Supreme Court has held that a plaintiff may state an Equal Protection claim "by alleging that a State 'adopted a reapportionment scheme so irrational on its face that it can be understood only as an effort to segregate voters into separate voting districts because of their race, and that the separation lacks sufficient justification[,]" *Hays*, 515 U.S. at 738-39 (quoting *Shaw v. Reno*, 509 U.S. 630 (1993)). However, "[a] voter has standing to bring a racial-gerrymandering claim only if he votes in a gerrymandered district, or if specific evidence demonstrates that he has suffered the special harms that attend racial gerrymandering." *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 283 (2015) (Scalia dissenting) (citing *United States v. Hays,* 515 U.S. 737, 744–745 (1995) (emphasis added)). The *Hays* Court dismissed the Equal Protection claims brought by litigants who lacked standing, stating, "In this litigation, appellees have not produced evidence sufficient to carry the burden our standing doctrine imposes upon them." *Hays*, 515 U.S. 737 at 45. Citing *Shaw*, the *Hays* Court outlined the "standing doctrine" in the racial gerrymandering context as follows:

> Demonstrating the individualized harm our standing doctrine requires may not be easy in the racial gerrymandering context, as it will frequently be difficult to

discern why a particular citizen was put in one district or another. *See id.*, at 646, 113 S.Ct., at 2826 (noting "the difficulty of determining from the face of a single-member districting plan that it purposefully distinguishes between voters on the basis of race"). Where a plaintiff resides in a racially gerrymandered district, however, the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action, *cf. Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). Voters in such districts may suffer the special representational harms racial classifications can cause in the voting context. On the other hand, where a plaintiff does not live in such a district, he or she does not suffer those special harms, and any inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference. Unless such evidence is present, that plaintiff would be asserting only a generalized grievance against governmental conduct of which he or she does not approve.

*Id.* at 744–45 (citations and quotations in original).

In another U.S. Supreme Court case decided in 2000, the Court again held that a plaintiff residing in a district adjacent to an allegedly racially gerrymandered district did not have standing to bring an Equal Protection claim. *Sinkfield v. Kelley*, 531 U.S. 28, 30-31 (2000) (plaintiffs "have neither alleged nor produced any evidence that any of them was assigned to his or her district as a direct result of having personally been subjected to a racial classification [. . .] We rejected that argument in Hays, explaining that evidence sufficient to support a Shaw claim with respect to a majority-minority district did not prove anything with respect to a neighboring majority-white district in which the appellees resided. Accordingly, an allegation to that effect does not allege a cognizable injury under the Fourteenth Amendment.").

In their *Complaint*, Plaintiffs allege District 9 was subdivided to encompass the boundaries of the Turtle Mountain Indian Reservation, and that race was the predominant factor in the formation of the Subdistrict boundaries. *Complaint* at ¶¶ 29-30. In other words, Plaintiffs allege that Subdistrict 9A - which encompasses the Reservation – is the Subdistrict which was racially gerrymandered based upon the race of the majority of its voting age residents being Native

Americans.  This is strikingly similar to the claims raised by the litigants in *Hays* and in *Sinkfield*. But like those litigants who were held to lack the required standing to bring suit, Plaintiffs in this litigation do not allege and have not provided any other evidence that they either live and vote in the challenged racially gerrymandered district, Subdistrict 9A, or that they were personally subjected to any racial classification related to the redistricting of District 9.

At their respective depositions, both Plaintiffs testified that they do not reside in Subdistrict 9A and that they are not Native Americans. Plaintiff Walen testified in relevant part as follows:

> Q.  And that – am I right that [your residence is] in Legislative District 4 for the state Senate and in District 4A for the State House?
> A.  Correct. . .
> Q.  Mr. Walen, what is your race or ethnicity?
> A.  American, Caucasian. . .
> Q.  Would it be fair to say you don't consider yourself to be an American Indian?
> A.  Correct.

Walen Depo. (Wiederholt Aff., ***Exhibit 37***) at 14, l. 24 – 15, l. 23; 25, ll. 12 – 14; 26: ll. 1 - 3.

Plaintiff Henderson, who lives in Subdistrict 9B and whose wife was elected to the Legislature for Subdistrict 9B in 2022,[10] testified:

> Q.  And just I think we – I think this was implied, but you live in the Subdistrict 9B. Is that right?
> A.  That's correct. . .
> Q.  What do you consider to be your race or ethnicity?
> A.  White, I guess.
> Q.  Do you consider yourself to be Native American?
> A.  No.

Henderson Depo. (Wiederholt Aff., ***Exhibit 38***) at 27:24-28:2, 36:21-24.

_____

[10] Henderson concedes his wife is the House Representative of Subdistrict 9B.  Henderson Depo. (Wiederholt Aff., ***Exhibit 38***) at 39, l. 5 – 40, l. 3.  The ND Legislature's website reflects Rep. Donna Henderson is the elected House Member from Subdistrict 9B, has been in the "House since 2023", and is married to "Paul"   https://www.ndlegis.gov/districts/2023-2032/district-9; https://www.ndlegis.gov/biography/donna-henderson (Wiederholt Aff., ***Exhibit 39***).

There is no evidence to suggest either of the Plaintiffs lived in or lives in Subdistrict 9A, one of the two Subdistricts they contend was impermissibly drawn based on race. Indeed, as to the facts surrounding District 9, Plaintiff Henderson would actually appear to have more representation in the Legislature than any other voting age resident of his Subdistrict, which further demonstrates his purported vote dilution claim is without any factual support at all. Plaintiff Walen testified he lives in Subdistrict 4A, and has not contended or provided any evidence that he lives in Subdistrict 9A. Based on the controlling legal precedent, the Court should determine Plaintiffs lack standing to assert their Equal Protection claims concerning Subdistrict 9A.

While Plaintiffs will almost certainly argue they do have the required standing (or at least Plaintiff Henderson has standing) to bring suit because they were "deprived of multi-member representation in the North Dakota House of Representatives" by the subdividing of District 9, *Complaint* at ¶ 50,[11] that kind of position was expressly rejected in *Hays* where the Court held such arguments could not show the kind of "individualized harm" sufficient to confer standing. *Hays*, 515 U.S. at 747; *Gill v. Whitford*, 138 S. Ct. 1916, 1921 (2018) (citing *Hays*, held: "A plaintiff who complains of gerrymandering, but who does not live in a gerrymandered district, 'assert[s] only a generalized grievance against governmental conduct of which he or she does not approve. . .'"). Because there is no Plaintiff who actually resides or even resided in Subdistrict 9A

---

[11] Plaintiffs' claims asserting alleged loss of representation because of the subdivision of their Districts are not per se actionable, but are merely generalized grievances. Reynolds v. Sims, 377 U.S. 533, 576–77 (1964) ("Different constituencies can be represented in the two houses. One body could be composed of single-member districts while the other could have at least some multimember districts."); *see also White v. Regester*, 412 U.S. 755, 765 (1973) (stating, "[p]lainly, under our cases, multimember districts are not per se unconstitutional, nor are they necessarily unconstitutional when used in combination with single-member districts in other parts of the State"). As set forth below, because of the nature of their claims against subdistricting, which is not raced based and is allowed under N.D. law, Plaintiffs have not stated a redressable injury.

– the portion of District 9 allegedly drawn due solely to race – Plaintiffs have stated at most a generalized grievance that is insufficient to confer Article III standing.

Plaintiffs will also argue the federal standing precedent applies only to "districts" as such and not to "Subdistricts" as in the instant case, and they will point to the evidence showing that Plaintiff Henderson lives in the same "District" he challenges, District 9.  But this kind of argument too would run afoul of the Supreme Court's justification for determining plaintiffs must be "personally subjected to a racial classification" in order to achieve Article III standing, which is not true of Plaintiff Henderson. The Supreme Court's justification for a personalized injury being necessary for standing was stated as follows in a 2015 case:

> Our district-specific language makes sense in light of the nature of the harms that underlie a racial gerrymandering claim. Those harms are personal. They include being "personally ... subjected to [a] racial classification," *Vera,* [] (principal opinion), as well as being represented by a legislator who believes his "primary obligation is to represent only the members" of a particular racial group, *Shaw I* []. They directly threaten a voter who lives in the *district* attacked. But they do not so keenly threaten a voter who lives elsewhere in the State. Indeed, the latter voter normally lacks standing to pursue a racial gerrymandering claim. *Hays*[.]

*Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 263, 135 S. Ct. 1257, 1265, 191 L. Ed. 2d 314 (2015) (cleaned up) (quoting *Bush v. Vera*, 517 U.S. 952, 957 (1996); *Shaw v. Reno*, 509 U.S. 630, 648 (1993)).  Even if the standing analysis has thus far focused only on Districts and not on Subdistricts, Plaintiff Henderson is not represented by a legislator who believes her primary obligation is representing only Native Americans.  On the contrary, he is represented by his wife.  Nor can he argue or present evidence District 9's State Senator, also a Republican Party member like Plaintiff Henderson's wife, has a primary obligation of representing only Native Americans. [12]  Neither Plaintiff Henderson nor Plaintiff Walen live in the "district attacked" which

---

[12] https://www.ndlegis.gov/districts/2023-2032/district-9 (Wiederholt Aff., ***Exhibit 39***).

is Subdistrict 9A.  Thus, neither can be said to be directly threatened or subjected to a racial classification by racial gerrymandering, and their injury is at most a generalized one.

Because Plaintiffs have not articulated or shown any evidence of personalized harm concerning the Challenged Subdistrict 9A, there is no standing and the Court therefore lacks jurisdiction to consider that particular Equal Protection claim.  *Carney*, 141 S.Ct. at 499 (citations omitted).  The plaintiff "bears the burden of establishing standing as of the time" of the lawsuit and "maintaining it thereafter."

**B.      *Plaintiffs Have Not Established Race Was A Predominant Factor*[13]**

Plaintiffs have failed in their burden of proof to show the North Dakota Legislature "subordinated traditional race-neutral districting principles to racial considerations":

> [A] plaintiff alleging racial gerrymandering bears the burden "to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." [] To satisfy this burden, the plaintiff "must prove that the legislature subordinated traditional race-neutral districting principles ... to racial considerations." []

*Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quoting Miller v. Johnson, 515 U.S. 900, 916 (1995). Traditional race-neutral redistricting principles were first referenced in *Shaw v. Reno*, 509 U.S. 630 (1993) and were expanded in later case law to include: (1) compactness,[14] (2) contiguity,[15] (3) preservation of counties and other political subdivisions.[16]

---

[13] This argument is made in the alternative as it concerns Plaintiffs' claims challenging the Subdistrict 9A, and is made to the extent the Court determines one or more of the Plaintiffs has the required Article III standing to challenge that Subdistrict.

[14] *Shaw v. Reno*, 509 U.S. 630 (1993).

[15] *Id.*

[16] *Id.*

(4) preservation of communities of interest,[17] (5) preservation of cores of prior districts,[18] and (6) protection of incumbents.[19]

Plaintiffs have not alleged that any the Challenged Subdistricts violate any of the foregoing traditional redistricting principles.  *See generally* Complaint.  Additionally, the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution requires that state legislative districts have substantial population equality.  *Reynolds v. Sims*, 377 U.S. 533, 578 (1964).  In the present case, there is no allegation that any Districts or Subdistricts deviate too far from the ideal district population size of 16,576 (with the ideal Subdistrict population size of 8,288: half of the population of a full District).  (Wiederholt Aff., ***Exhibit 40)*** at p. 1, ¶ 2.

While Plaintiffs will cherry-pick from comments made by N.D. legislators during committee discussions and floor speeches, in reality the record shows race did not predominate.  As reflected in the undisputed fact section above, there were extensive hearings in the Legislative Assembly and committees, most of which Plaintiffs have not referenced in briefing to date and will not reference on summary judgment.  The Redistricting Committee met six times (three of those meetings spanned two-days each), the Tribal and State Relations Committee met three times in relevant public meetings, and the Joint Redistricting Committee met twice. Additionally, both the House and Senate held floor sessions to debate and vote on House Bill 1504. In total, the legislative history relating to redistricting includes over 40 hours of testimony and debate.

That testimony and debate demonstrates traditional principles predominated over race. In this regard, the Redistricting Committee was given a memo prepared by Legislative Council describing the traditional redistricting principles and legal basis for same, along with a discussion

---

[17] *Miller v. Johnson*, 515 U.S. 900, 916 (1995); *Abrams v. Johnson*, 521 U.S. 74, 92 (1997).

[18] *Karcher v. Daggett*, 462 U.S. 725, 740 (1983)

[19] *Id.*

of Constitutional and VRA requirements and considerations. *See* August 26, 2021 – Transcript of the Video-Recorded Meeting of the Redistricting Committee – State of North Dakota (Doc. 100-1) at 189, l. 3 -  190: l. 8  (Sen. Holmberg reminding the Committee to "keep in mind" past redistricting criteria as reflected in the memo, "such things as compactness [] political subdivision boundaries, [] county lines[,] preservation of communities of interest, core of prior districts, [] protection of incumbents[,] and obviously compliance with Section 2 of the [VRA]."); Memo. by Emily Thompson of the N.D. Legislative Council (Wiederholt Aff., ***Exhibit 7***).  The record reflects traditional redistricting principles were central to the decisions of the Legislature, including with regard to the Challenged Subdistricts.

At the Committee level, the testimony confirms traditional redistricting principles were front and center.  To illustrate, testimony by Sen. Sorvaag confirms the focus on those traditional principles informed the Legislature's deliberations, stating: "Mine isn't much a question but it's a comment on the discussion on this traditional -- these districting principles. And I think the one thing we need to -- we're talking about ranking, which one -- I think you've got to include them all. And if you do it right, they're all coming into play in most situations." *See* September 22, 2021 Transcription of Video File – North Dakota Legislative Assembly Redistricting Committee (Doc. 100-4) at 84: l. 15 – 85: l. 18.  Later, during floor debate, the discussion remained focused to a large extent on those traditional redistricting considerations.  *See e.g.*, November 9, 2021 Transcription of Video File North Dakota House HB 1504 / Joint Redistricting (Doc. 100-8) at 65, ll. 21-25) (Devlin Testimony).

### 1. The Legislature Considered Compactness.

Compactness is included in the traditional redistricting principles, and is furthermore mandated by the North Dakota Constitution.  N.D. Const., Art. IV, Sec. 2.  As reflected in the

discussion above, and as confirmed in the maps themselves, it is obvious the Legislature considred compactness.[20]   Plaintiffs do not contend and the evidence does not reflect the Challenged Subdistricts or the Districts themselves in which they are drawn are "so bizarre" so as to be "unexplainable on grounds other than race".  *Cf.* Shaw v. Reno, 509 U.S. 630, 641, 658 (1993) (stating, "It is unsettling how closely the [N.C.] plan resembles the most egregious racial gerrymanders of the past." *held:* "[N.C.] adopted a reapportionment scheme so irrational on its face that it can be understood only as an effort to segregate voters into separate voting districts because of their race[.]").  Nor do Plaintiffs raise any challenge concerning the Subdistricts' compactness.  Nevertheless, it is clear that the shapes of Subdistricts 4A and 9A are of roughly square proportion, and as measured under any of the available scientific compactness measures, are shown mathematically to be compact.[21]

Additionally, the State considered the compactness of the Challenged Subdistricts in its consideration of House Bill 1504.  At the committee level, compactness was discussed at length. For example, during the presentation delivered to the Redistricting Committee by Ben Williams of National Conference of State Legislators (NCSL), he went into great detail concerning

---

[20] *See* North Dakota Redistricting Plan, H.B. 1504, 67th N.D. Legis. Spec. Sess. (Nov. 8, 2021), https://www.ndlegis.gov/files/district-maps/2023-2032/finalmaphb1504.pdf, (last visited Feb. 28, 2023) Wiederholt Aff., ***Exhibit 35***.

[21] *See* Expert Report of M.V. Hood III (Wiederholt Aff., ***Exhibit 41***), issued for the companion case, entitled, *Turtle Mountain Band of Chippewa Indians, et. al. v. Alvin Jaeger*, in his official capacity as Secretary of State of North Dakota, Case No. 3:22-cv-00022, at pgs. 7-8.  Note that Dr. Hood measures the compactness of District 9 but does not do so for District 4 as District 4 is not at issue in the *Turtle Mountain* case.  Intervenor's Expert Dr. Loren Collingwood determined District 4A is compact when utilizing the standard compactness measurements.  *See* Dr. Collingwood Report (Wiederholt Aff., ***Exhibit 42***) at 3 (stating, "It scores very high on measures of compactness.").  Dr. Hood's report is offered to show Plaintiffs' requested relief would violate the VRA, and is not intended to substitute for the evidence considered by the Legislature.

compactness. *See* August 26, 2021–Transcript of the Video-Recorded Meeting of the Redistricting Committee – State of North Dakota (Doc. 100-1) at 51: l. 10 – 52: l. 15; 56: l. 25 – 57: l. 15.

### 2.   The Legislature Considered Contiguity

The same sort of analysis concerning compactness applies equally to the contiguity of the Challenged Subdistricts, also a principle required by North Dakota's Constitution. N.D. Const., Art. IV, Sec. 2.  Plaintiffs do not provide any basis to challenge Defendants on the contiguity issue either and have not provided any record evidence that would suggest the Challenged Subdistricts are drawn in a non-contiguous fashion.  A straight forward review of the maps confirms they were not. *See* North Dakota Redistricting Plan, H.B. 1504, 67th N.D. Legis. Spec. Sess. (Nov. 8, 2021), https://www.ndlegis.gov/files/district-maps/2023-2032/finalmaphb1504.pdf, (last visited Feb. 28, 2023) Wiederholt Aff., ***Exhibit 35***.  The undisputed evidence confirms contiguity was considered by the Legislature and contiguity is borne out in the Challenged Subdistricts.[22]

### 3.   The Legislature Considered Preservation of Counties and Political Subdivisions.

Another traditional redistricting factor the State considered in moving and passing House Bill 1504 is the preservation of Counties and other political subdivisions.  Plaintiffs challenge the redistricting decision resulting in Subdistrict 4A and 9A primarily on the basis they are drawn largely to coincide with the borders of the Fort Berthold and Turtle Mountain Indian Reservations While Subdistrict 4A carves out parts of 4 counties (Mountrail, Walsh, Dunn, and McLean) the boundaries of the Subdistrict are largely drawn using the boundaries of the Fort Berthold Indian Reservation.  *See* Wiederholt Aff., ***Exhibit 43***.  The Turtle Mountain Indian Reservation is located

---

[22]August 26, 2021 – Transcript of the Video-Recorded Meeting of the Redistricting Committee – State of North Dakota (Doc. 100-1) at 52, l. 16 – 53: l. 13 (Mr. Williams of the NCSL testifying before the Redistricting Committee about contiguity).

in Rolette County, North Dakota.  Rolette County and a large part of the Turtle Mountain Indian Reservation are contained entirely within Subdistrict 9A.  *Id.*

States are allowed to draw district boundaries around the borders of Indian Reservations without running afoul of Equal Protection.  *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1019 (8th Cir. 2006) (held: redistricting plan partially drawn around the Pine Ridge Indian Reservation "easily pass[es] muster").  Generally accounting for the shape of the Reservations in creating Subdistricts is consistent with the race-neutral consideration of respect for political subdivisions, as the reservations are governed by tribes that exercise tribal sovereignty within those boundaries.  Not only do the maps themselves confirm the Legislature followed and preserved traditional boundaries, but this topic was discussed prior to passage of House Bill 1504.

The evidence shows the Legislature considered drawing their district lines around political subdivision lines, which included the counties. For example, Sen. Bekkedahl, a member of the Redistricting Committee, testified he received a lot of input from county auditors about "keeping those county lines for the elections in place if we can."  *See* September 22, 2021 Transcription of Video File – North Dakota Legislative Assembly Redistricting Committee (Doc. 100-4) at 81: l. 20 – 82: l.  Mr. Williams of the NCSL exchanged testimony with the Redistricting Committee about keeping counties whole and not splitting counties and some of the reasons why it should be avoid if possible.  *See* August 26, 2021 – Transcript of the Video-Recorded Meeting of the Redistricting Committee – State of North Dakota (Doc. 100-1) at 55, l. 19 – 56, l. 24.[23]  The North Dakota Association of Counties (NDAC) also testified at length as to this traditional consideration and urging counties to be remain whole if possible, as to do otherwise causes hardship in the

---

[23] Mr. Williams of the NCSL also testified to the Committee about drawing lines around Indian Reservations. *See* August 26, 2021 – Transcript of the Video-Recorded Meeting of the Redistricting Committee – State of North Dakota (Doc. 100-1) at 100, ll. 1-13.

counties and townships.  *See* September 22, 2021 Transcription of Video File – North Dakota Legislative Assembly Redistricting Committee (Doc. 100-4) at 4: ll. 8-25; 5: ll. 1-10; 7: ll. 7 – 24.

During House debate, and despite his opposition to subdividing Districts 4 and 9, Rep. Koppelman also commented specifically on the county lines being addressed :

> REPRESENTATIVE KOPPELMAN: Thank you, Representative Devlin. And I appreciate the fact that -- it sounds like you guys went out of your way to keep those communities of interest and populations together in the whole boundaries of District 9 and District 4. And so that's really, I think, a good thing because that's what we're going to vote on in Division B.
> But Division A is about subdistricts. And I think if you do look in some of the history of where the court cases have arrived and the history of gerrymandering various ethnic populations or communities in other states, maybe not South Dakota, but many other states, their gerrymandering efforts are extreme. I mean, there are little fingers that go off in every direction, and I don't see that in the map that's in front of us today.
> I see relatively contiguous rectangles and things that follow normal landmarks, either rivers, or roads, things of that nature that make sense, that keep people, you know, somewhat together.
> [. . . .]
> And so there could be merits to subdistricts. There could be concerns about gerrymandering happening. But I don't see that in our process. Matter of fact, I see them trying to follow county lines and other logical barriers.

*See* November 9, 2021 Transcription of Video File North Dakota House HB 1504 / Joint Redistricting, (Doc. 100-8) at 34: l. 16 – 36: l. 7. Despite his opposition to subdistricting, Rep. Koppelman confirmed there appeared to be no gerrymandering in the proposed maps, and his comments also support compactness, contiguity, and preserving communities of interest.  *Id.*

4.  The Legislature Considered Preservation of Communities of Interest

Preservation of Communities of Interest is similar to but not identical to preserving counties and political subdivision lines.  Both the Redistricting Committee and the Tribal and State Relations Committee received copious information and testimony on this issue.  The drawing of the Challenged Subdistrict lines to preserve communities of shared interest – and in particular those Native Americans living on Indian Reservations – is consistent with the race-neutral

consideration of preserving communities of interest. The legislative record contains numerous requests from tribal members and representatives, and others, to recognizing Reservations and Tribal communities as communities of interest on grounds of similar language, culture, economics, and identity.  *See* Thompson Aff., *Exhibits C*, *E*, *F*, *G*, *H*, *M*, *N*, *O*, *P*, *R*, *T*, *U*, *V*, *W*, *X*, *Y*, *Z* (Docs. 20-3, 20-5 through 20-8, 20-13 through 20-16, 20-18, 20-20 through 20-26).  Non-native American groups also testified in support of the Legislature preserving communities of interest.[24] There can be no question the Legislature considered this traditional redistricting principle.

### 5.   The Legislature Considered Preservation of Cores of Prior Districts

Another of the traditional redistricting principles is the protection of core districts.  At the Committee level, there was abundant discussion of this issue.  For example, in her testimony on behalf of the Legislative Council, Emily Thompson of the Legislative Council and various Committee members testified about those core districts, which the Legislature sought to preserve as far as possible.  *See e.g.*, September 22, 2021 Transcription of Video File – North Dakota Legislative Assembly Redistricting Committee (Doc. 100-4) at 80: l. 25 – 81: l. 10.

### 6. The Legislature Considered Protection of Incumbents

Another of the traditional redistricting principles is the protection of incumbents.  The Legislature also considered this precondition prior to adopting the Challenged Subdistricts.  The following testimony presented at the Committee level provides just one example of this:

> [Senator Bekkedahl:]  So I'm going to go back to the – a later page of the Legislative -- of the same memorandum we were given at that meeting. The item six, protection of incumbents. It notes in there that 12 states require drafters to avoid pairing incumbents. "Placing two or more incumbents in a single district leads to one incumbent having to move, retire, or be defeated and the policy against pairing

---

[24] For example, the N.D. Farmers Union testified before the Redistricting Committee about keeping county lines intact and serving "communities of interest" by subdividing districts.  *See* August 26, 2021 – Transcript of the Video-Recorded Meeting of the Redistricting Committee – State of North Dakota (Doc. 100-1) at 151: l. 20 – 153: l.

incumbents aims to promote continuity of representation." So my guess is that probably all 50 states adhere more to -- as a priority, would adhere to compactness, and contiguity, and preservation of political subdivision boundaries probably over the protection of incumbents, since only 12 require that. But that's just my interpretation, Mr. Chairman.

*See* September 22, 2021 Transcription of Video File – North Dakota Legislative Assembly Redistricting Committee (Doc. 100-4) at 82: ll. 5 – 20.

As indicated, Plaintiffs will attempt to paint a false portrait of what happened at the Legislature and what was said by various legislative members to make it appear race predominated. However, stray comments about race by individual legislators are insufficient to prove race predominated. The U.S. Supreme Court has said: "[I]t must be kept in mind that references to race by those responsible for drawing or adopting a redistricting plan are not necessarily evidence that the plan was adopted for improper racial reasons." *Cooper v. Harris*, 137 S. Ct. 1455, 1497 (2017) (Alito, S. concurring).

Also, as discussed in the next section, the Court has frequently stated that, "all legislatures must [] take into account the possibility of a challenge under § 2 of the [VRA] claiming that a plan illegally dilutes the voting strength of a minority community." *Id.* (citing *League of United Latin American Citizens v. Perry,* 548 U.S. 399, 425 (2006). "[B]ecause of the [VRA], consideration and discussion of the racial effects of a plan may be expected." *Cooper*, 137 S. Ct. at 1497 (Alito, S. concurring). As shown below, the Legislature was keenly aware of a possible VRA claim as reflected in their deliberations as well as in the evidence it considered.

**C.**     ***Even If The Court Were to Find Race Was A Predominant Factor, The State Had a Compelling Governmental Interest in Complying with the Voting Rights Act.***

Plaintiffs bring this action purely on Equal Protection grounds and do not raise federal claims under the VRA. *See generally* Complaint. Plaintiffs bear the burden to prove race was the

predominant factor in shaping the districts. *Shaw v. Reno*, 509 U.S. 630, 647 (1993); *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

"Where a challenger succeeds in establishing racial predominance [in his Equal Protection Claim],[25] the burden shifts to the State to demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest." *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S.Ct. 788, 800-801 (2017) (internal citations omitted). The United States Supreme Court has held compliance with the VRA is a compelling interest that satisfies strict scrutiny. *Wisconsin Legislature v. Wisconsin Elections Comm'n*, 212 L. Ed. 2d 251, 142 S. Ct. 1245, 1250 (2022) (citing *Cooper v. Harris*, 581 U.S. 285, 301 (2017) (stating, "we have long assumed that complying with the VRA is a compelling interest.").[26]

As an initial matter, Plaintiffs argue that the ND Legislature must have conducted statistical analyses through experts prior to passing House Bill 1504 in order to justify the Challenged Subdistricts under the VRA. In other words, Plaintiffs essentially argue the Legislature is not allowed to use its own judgment based on the evidence it has received in seeking to make redistricting decisions, but rather that it must have relied on experts and expert analysis for such decisions or the decisions are fatally flawed and Unconstitutional. But that is not the applicable legal standard set forth in the controlling case law, and in practice would result in fully VRA-compliant Districts/Subdistricts being overturned by the courts. That cannot be the intent of the

---

[25] Plaintiffs' Equal Protection claims are subject to the following legal standard:

> To prove [an Equal Protection] claim, it must be shown either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the placement of a significant number of voters within or without a particular district.

*Harvell v. Blytheville Sch. Dist. No. 5*, 126 F.3d 1038, 1041 (8th Cir. 1997).

[26] Plaintiffs concede a redistricting decision in compliance with Section 2 of the VRA satisfies strict scrutiny. Complaint at ¶¶ 20-23.

United States Supreme Court jurisprudence in this area of law.  In fact, the United States Supreme Court has not mandated redistricting decisions be made by experts rather than by states' legislatures. Rather, the analysis turns on whether the particular legislature's redistricting actions are in compliance with the VRA.

Contrary to Plaintiffs' suggestions, the United States Supreme Court in *Wisconsin Legislature* did not require expert analyses and complex statistical calculations prior to the adoption of a redistricting plan, but rather stated the state must have a "strong basis in evidence" for its redistricting decision when challenged on Equal Protection grounds. *Wisconsin Legislature*, 142 S. Ct. at 1249 (citation omitted). Similarly, in an earlier opinion, *Bethune-Hill*, the Court held the State could not rely on *ad hoc* arguments that never actually informed that redistricting decision.  *Bethune-Hill*, 580 U.S. at 189–90.  The *Bethune-Hill* Court fleshed out the "strong evidence" to support narrow tailoring as follows:

> Turning to narrow tailoring, the Court explained the contours of that requirement in *Alabama*. When a State justifies the predominant use of race in redistricting on the basis of the need to comply with the [VRA], "the narrow tailoring requirement insists only that the legislature have a strong basis in evidence in support of the (race-based) choice that it has made." 575 U.S., at 278, 135 S.Ct., at 1274 (internal quotation marks omitted). That standard does not require the State to show that its action was "actually ... necessary" to avoid a statutory violation, so that, but for its use of race, the State would have lost in court. *Ibid.* (internal quotation marks omitted). Rather, the requisite strong basis in evidence exists when the legislature has "*good reasons* to believe" it must use race in order to satisfy the [VRA], "even if a court does not find that the actions were necessary for statutory compliance." *Ibid.* (internal quotation marks omitted).

*Id.* at 193–94.

Defendants are not relying on *ad hoc* arguments, but rather are relying on the record that indicates they indeed had strong evidence and good reasons to believe they would be subject to a VRA challenge had they not adopted the Challenged Subdistricts.  "Good reasons to believe" the redistricting would avoid a Section 2, VRA claim means the ND Legislature does not have to prove

in this lawsuit that it would actually have violated the VRA and would have lost in court had it not adopted the Challenged Subdistricts.

The undisputed evidence shows the Legislature had good reasons and strong evidence to create the Challenged Subdistricts in order to comply with and avoid a statutory violation of Section 2 of the VRA with respect to the Native American populations in and near the Fort Berthold Reservation and Turtle Mountain Reservation.  The U.S. Supreme Court has identified three preconditions (the *Gingles* preconditions), which are necessary preconditions for a Section 2 claim under the VRA.  *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).  The three *Gingles* preconditions are:

> 1. "[T]he minority group...is sufficiently large and geographically compact to constitute a majority in a single-member district,"
> 2. "[T]he minority group...is politically cohesive," and
> 3. "[T]he white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances...—usually to defeat the minority's preferred candidate."

*Id*.

> If all three preconditions are established, then a court must consider the totality of the circumstances and determine, based upon a searching practical evaluation of the past and present reality, whether the political process is equally open to minority voters.  This determination is peculiarly dependent upon the facts of each case,' and requires an intensely local appraisal of the design and impact of the contested electoral mechanisms.  In undertaking this practical evaluation, courts look to the non-exhaustive list of "typical factors" identified in the Senate Report accompanying the 1982 amendments to the VRA ("Senate Factors").

*Missouri State Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Ferguson-Florissant Sch. Dist.*, 201 F. Supp. 3d 1006, 1016 (E.D. Mo. 2016), *aff'd*, 894 F.3d 924 (8th Cir. 2018) (internal citations and quotations omitted).[27]

---

[27] The Senate Factors include: (1) The history of official voting-related discrimination in the state or political subdivision; (2) The extent to which voting in the elections of the state or political subdivision is racially polarized; (3) The extent to which the state of political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the

1.      The First *Gingles* Precondition Was Met.

The first *Gingles* precondition is that "the minority group [. . .] is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50.  This precondition was met with respect to the Native American populations now part of the Challenged Subdistricts 4B and 9A.  Abundant testimony and evidence was provided to the Legislature regarding the growth of the Native American populations in and around the Fort Berthold Indian Reservation and the Turtle Mountain Indian Reservation.

As discussed in the undisputed facts, above, the Redistricting Committee submitted its final report on November 1, 2021 regarding redistricting to the legislative management and noting the Redistricting Committee solicited and received testimony and other evidence from multiple individuals representing tribal interests, tribal nations, and Native American rights organizations, which testimony and evidence:

- Noted the growth of Native American populations in North Dakota;
- Urged the creation of subdistricts for Native American voters to comply with the federal [VRA] and prevent dilution of votes cast by Native Americans;
- Requested tribal members be considered communities of interest;
- Urged the committee to provide equitable, more direct, and more responsive representation for Native Americans;
- Urged the committee not to split reservations into multiple districts;
- Noted multiple Native American candidates have had unsuccessful campaigns for membership in the House;

---

minority group, such as unusually large election districts, majority-vote requirements, and prohibitions against bullet voting; (4) The exclusion of members of the minority group from candidate slating processes; (5) The extent to which minority group members bear the effects of discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) The use of overt or subtle racial appeals in political campaigns; and (7) The extent to which members of the minority group have been elected to public office in the jurisdiction.  *See* S.Rep. No. 97-417, 97th Cong., 2d Sess. (1982), pp.28-29.

> • Asserted there has been a history of discrimination in North Dakota against Native Americans; and
>
> • Asserted a history of racial bloc voting has prevented Native American voters from electing their candidates of choice.

Wiederholt Aff., ***Exhibit 30*** at pp. 19-30.  The Redistricting Committee's final report also notes it received updates from committee members on the Tribal and State Relations Committee, which received similar testimony.  *Id.*  The final report further indicates the Redistricting Committee reviewed the 2020 Census data for tribal reservations, including the total population, total voting-age population, American Indian population, and American Indian voting-age population for each of the five reservations in North Dakota.  *Id.*

Additionally, the final report notes the Redistricting Committee received information from the Legislative Council staff and testimony from others on constitutional and statutory provisions regarding the use of race in redistricting, including in relation to the 14th Amendment to the United States Constitution, partisan gerrymandering, the VRA, and applicable legal tests.  *Id.* at 24-28. The final report also notes the Committee members engaged in multiple discussions regarding Subdistricts, including Subdistricts 4 and 9, with discussion of whether to draw Subdistrict boundaries based on race, discussion of the ability of Subdistricts to prevent dilution of Native Americans' votes, discussion of a preference for legislatively drawn district boundaries over court-drawn boundaries that may result from litigation, and discussion of Subdistricts providing communities of interest with an opportunity to elect their candidates of choice.  *Id.* at 29-30.

The data available to the Legislature confirms the Native American population in and near Fort Berthold is sufficiently large and geographically compact to constitute a majority of the voting age population (62%) in the single member Subdistrict 4A, wherein one member of the House is elected. (Wiederholt Aff., ***Exhibit 43***); *see also* https://www.ndlegis.gov/assembly/67-

2021/special/approved-legislative-redistricting-maps.   The Native American population in and

near the Turtle Mountain Reservation is also sufficiently large and geographically compact to

constitute a majority of the voting age population (77%) in the single member Subdistrict 9A,

wherein one member of the House is elected.   *Id.*   Plaintiffs have not and cannot present any

evidence to contradict the foregoing evidence concerning the first *Gingles* precondition.

2.   <u>The Second *Gingles* Precondition Was Met.</u>

The Second *Gingles* precondition is that "[T]he minority group...is politically cohesive",

which the courts have indicated means they tend to vote for the same preferred candidate of choice.

For the purposes of this lawsuit, the Legislature was required to have strong evidence or good

reason to believe the Native American populations in and around what is now Subdistricts 4A and

9A tended to vote for the same political party or candidate of choice.   It is well known in North

Dakota that Native American populations tend to vote for the Democratic candidate and White

populations (non-Hispanic) tend to vote for the Republican candidate.   During Senate debate,

Senator ____ stated the obvious fact for District 4 that not one Republican had been elected out of

that District "in decades", and he stated what all of the State Senators knew: that "the precincts on

the reservation voted for and then which candidates won, right, so you know which was the

candidate of their choice."   *See* November 10, 2021 Transcription of Video File North Dakota

Senate HB 1504 / Joint Redistricting (Doc. 100-9).[28]

3.   <u>The Third *Gingles* Precondition Was Met</u>

---

[28] Dr. Hood's report issued for this lawsuit confirms Native American voters are politically cohesive in North Dakota, including in Districts 4 and 9, where they tend to vote Democratic. Expert Report of M.V. Hood III (Walen case) (Doc. 100-10) at 6, 9.  Dr. Hood's report is offered to show Plaintiffs' requested relief would violate the VRA, and is not intended to substitute for the evidence considered by the Legislature.

The third *Gingles* precondition is that "the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances...usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51.  The Legislature received strong evidence the white majority in District 4 and the slight White minority in District 9 would vote as a bloc to defeat the Native American populations' candidate of choice if the Districts were not subdivided.  At the Committee Level and during floor debate, some legislative members were not so sure this precondition was met, but their testimony confirms they knew it was a risk.  For example Bekkedahl testified: "The third one is, 'A minority group must demonstrate the majority group votes sufficiently as a group to defeat the minority group's preferred candidate.' That's the one that I'm not sure. I think that's open to interpretation [. . . .] So I guess my take, Mr. Chairman, is I believe we have Number 1 and Number 2. Two of the Gingles are very evident in this case for a decision. I think it's up to everybody to make an interpretation on the third part of that.  *See* September 29, 2021 Redistricting Committee Transcript (Doc. 100-7) at 34: l. 15 – 35: l. 21.[29]

Others had stronger opinions on the third *Gingles* precondition.  In this regard, Rep. Schauer testified during House debate that the Third Gingles precondition (and the other preconditions) would definitely be met.  *See* November 9, 2021 Transcription of Video File North Dakota House HB 1504 / Joint Redistricting (Doc. 100-8) at 11: ll. 2-19.  Rep. Devlin testified he was equally convinced, stating, "the federal Voting Right Acts (sic) prohibits redistricting from diluting the vote of a racial minority by giving racial minority less opportunity than other groups to elect a minority group's candidate of choice. The candidate of choice, as you well know, doesn't have to be a minority or a tribal member. It can be anyone. But it is their choice." *Id.* at 28: ll. 5-

---

[29] *See also* testimony of Senator Kannianen suggesting in his opinion that the *Gingles* factors were not met.  November 10, 2021 Transcription of Video File North Dakota Senate HB 1504 / Joint Redistricting (Doc. 100-9) at 27: l. 23 – 28: l. 8.

18; 30: ll. 2-21.  While there was equally strong opposition in the Legislature to the Third *Gingles* precondition being met, the legal standard is clear that the State need not prove it certainly would have lost a Section 2, VRA claim.  The legal standard requires only good reasons to believe not subdividing would have resulted in a VRA violation, which the evidence shows has been satisfied.

As the evidence confirms, the Legislature had good reason to believe it would be in violation of the VRA if it did not adopt the legislative map that includes the Challenged Subdistricts.  Plaintiffs have not and cannot show facts or evidence to the contrary.  Nor have Plaintiffs disclosed an expert in this lawsuit, likely for the reason that no reputable expert would validate the relief Plaintiffs request, the removal of the Challenged Subdistricts.  As discussed below, the removal of the Subdistricts would almost certainly result in a violation of the VRA.

### D.  Plaintiff's Requested Remedy of Removing the Subdistricts Would Violate the Voting Rights Act.

In addition to their failure to show supporting evidence of an Equal Protection violation, Plaintiffs also seek a remedy that itself would run afoul of State and federal law.  In this regard, Plaintiffs request the Court act immediately to order the removal of the Challenged Subdistricts.  Yet Plaintiffs do not have the legal ability to obtain the relief requested because the Legislature's subdistricting of Districts 4 and 9 was not race based and because its actions are expressly provided for in North Dakota law.  The reality given the evidence is that the removal of the entirely lawful Subdistricts is not redressable in this action and it would violate the VRA.

While both Plaintiffs complain about their Districts being split (Walen Depo., at 23: ll. 4-4 – 24: l. 5; Henderson Depo., at 28: ll. 2- 22) and both seek the elimination of the Challenged Subdistricts, neither Plaintiff challenges the subdistricting provisions of the North Dakota

Constitution or the North Dakota Century Code, which expressly provide for subdistricting.[30]
Assuming *arguendo* the Court determined Plaintiffs' Equal Protection claims were meritorious,
the Court should take care not to order the kind of drastic relief requested by Plaintiffs when North
Dakota law expressly provides for subdistricting, and, the Supreme Court has counseled against
preempting or to seriously intruding on the redistricting prerogatives of the states.[31]

Just as importantly, the undisputed evidence demonstrates Plaintiffs' requested remedy of
the removal of the Subdistricts would itself be a violation of Section 2 of the VRA.  In this regard,
Dr. Hood indicates in his report that removal of the subdivision in District 9 would result in Native
American populations that would usually not be able to elect their candidate of choice, which
would be a violation of Section 2 of the VRA.  Hood Report (Wiederholt Aff., *Exhibit 41*) at 7
(concluding "Given the presence of racially polarized voting in the district ("LD 9"), it is unlikely
that the Native American candidate of choice would be regularly elected if the district did not
contain a majority Native American voting age population.").  He has similar opinions in relation
to the voting situation in District 4 without the subdivision.  *Id.* at 10 (concluding, "With the
exception of LD 4A, it is highly unlikely that a Native American preferred candidate of choice

---

[30] N.D. Constitution, Section 2, Article IV ("[a] senator and at least two representatives must be
apportioned to each senatorial district and be elected at large or from subdistricts from those
districts. The legislative assembly… may provide for the election of senators at large and
representatives at large or from subdistricts from those districts."); N.D.C.C. § 54-03-01.5
(providing for the requirements of districts and subdistricts, if created).

[31] "The Supreme Court has repeatedly held that 'redistricting [] legislative bodies is a legislative
task which the federal courts should make every effort not to preempt.'" *Diaz v. Silver*, 932 F.
Supp. 462, 465 (E.D.N.Y. 1996) (quoting *Wise v. Lipscomb*, 437 U.S. 535, 539 (1978)). "Federal-
court review of districting legislation represents a serious intrusion on the most vital of local
functions. It is well settled that "reapportionment is primarily the duty and responsibility of the
State."" *Miller v. Johnson*, 515 U.S. 900 (1995) (citations omitted). "[T]he Constitution leaves
with the States primary responsibility for apportionment of their federal congressional and state
legislative districts." *Growe v. Emison*, 507 U.S. 25 (1993) (citing U.S. Const. art. I, § 2).

would be elected within the geographic boundaries of LD 4 as a whole."). Intervenors' expert agrees that removing the subdivision in District 4 would essentially result in a violation of the VRA. *See* Dr. Collingwood Report (Wiederholt Aff., ***Exhibit 42***) at 21 (concluding in part, "Sub-District 4A thus affords Native American voters the opportunity to elect their candidates of choice that they otherwise lack in the absence of the sub-district.").

As indicated by all of the experts who have issued reports in this action opining on the effect of the removal of the Subdistricts, the preferred candidate of the Native American populations in and around Fort Berthold and Turtle Mountain Reservations would be regularly defeated by the White population. In other words, the removal of the Challenged Subdistricts would cause the *Gingles* preconditions to be instantly satisfied, thus setting up the State for another lawsuit. This cannot be a remedy envisioned or intended by the Supreme Court in its Constitutional jurisprudence or by Congress in the enactment of the VRA. Even if the Court were to determine Plaintiffs' claims had some merit, the remedy requested by them is not redressable under the VRA, and thus the Court should also enter summary judgment against Plaintiffs as to their requested remedy. *Noem v. Haaland*, 41 F.4th 1013, 1018 (8th Cir. 2022) (stating, redressability focuses on the "link between the injury and the remedy" and finding the requested remedy would not truly provide a remedy for plaintiffs alleged injury)

## CONCLUSION

For the foregoing reasons, Defendants request the Court grant summary judgment in their favor, dismissing the Plaintiffs' Complaint (Doc. 1) in its entirety with prejudice.

Dated this 28th day of February, 2023.


By:    */s/ Bradley N. Wiederholt*
      David R. Phillips (# 06116)
      Bradley N. Wiederholt (#06354)

Special Assistant Attorney General
300 West Century Avenue
P.O. Box 4247
Bismarck, ND 58502-4247
(701) 751-8188
dphillips@bgwattorneys.com
bwiederholt@bgwattorneys.com

James E. Nicolai (#04789)
Interim Solicitor General
Courtney R. Titus (#08810)
Deputy Solicitor General
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
(701) 328-4509
jnicolai@nd.gov
ctitus@nd.gov

Attorney for Defendants Doug Burgum, in his official capacity as Governor of the State of North Dakota; Michael Howe, in his official capacity as Secretary of State of the State North Dakota

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **DEFENDANTS DOUG BURGUM AND MICHAEL HOWE'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was on the 28th day of February, 2023, filed electronically with the Clerk of Court through ECF:

Paul Sanderson (#05830)
Ryan Joyce (#09549)
Evenson Sanderson PC
1100 College Drive, Suite 5
Bismarck, ND 58501
psanderson@esattorneys.com
rjoyce@esattorneys.com

Robert Harms (#03666)
815 N. Mandan St.
Bismarck, ND 58501
robert@harmsgroup.net

Mark P. Gaber (DC Bar No. 988077)

41

Molly Danahy
Nicole Hansen
CAMPAIGN LEGAL CENTER
1101 14th St. NW, Ste. 400
Washington, DC 20005
mgaber@campaignlegal.org
mdanahy@campaignlegalcenter.org
nhansen@campaignlegalcenter.org

Michael S. Carter, OK No. 31961
Matthew Lee Campbell
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80301
carter@narf.org
mcampbell@narf.org

Bryan L. Sells
PO BOX 5493
Atlanta, GA 31107-0493
bryan@bryansellslaw.com

Samantha Blencke Kelty
Native American Rights Fund
1514 P Street NW, Suite D
Washington, DC 20005
kelty@narf.org

By: _____/s/ Bradley N. Wiederholt_____
     Bradley N. Wiederholt