## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Charles Walen and Paul Henderson, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Doug Burgum, in his official capacity as | ) | |
| Governor of the State of North Dakota, and | ) | |
| Michael Howe, in his official capacity as | ) | **ORDER ON MOTIONS FOR** |
| Secretary of State of the State of North Dakota, | ) | **SUMMARY JUDGMENT** |
| | ) | |
| Defendants, | ) | Case No. 1:22-cv-31 |
| | ) | |
| and | ) | |
| | ) | |
| The Mandan, Hidatsa and Arikara Nation, | ) | |
| Lisa DeVille, and Cesareo Alvarez, Jr., | ) | |
| | ) | |
| Defendants-Intervenors. | ) | |

Before WELTE, Chief District Judge, ERICKSON, Circuit Judge, and HOVLAND, District Judge.

Plaintiffs Charles Walen and Paul Henderson move for summary judgment (Doc. 98) on their Equal Protection claim under the Fourteenth Amendment. They assert the subdivision of two North Dakota legislative districts are unconstitutional racial gerrymanders. Defendants North Dakota Governor Doug Burgum and Secretary of State Michael Howe (together, the "State") and Defendants-Intervenors the Mandan, Hidatsa, and Arikara ("MHA") Nation, and individual voters Lisa Finley-DeVille and Cesareo Alvarez, Jr. (collectively, "the MHA Tribe"), cross move for summary judgment. Doc. 101; Doc. 107. Walen and Henderson oppose the State's and the MHA Tribe's motions. Doc. 114; Doc. 115. The State and the MHA Tribe oppose Walen's and Henderson's motion. Doc. 111; Doc. 113. Because we find that the State's actions to draw the

subdistricts in districts 4 and 9 satisfy strict scrutiny, we grant the State's and MHA Tribe's motion and deny Walen's and Henderson's motion.

## I.    **FACTS**

Walen and Henderson are North Dakota residents and voters in districts 4 and 9, respectively. Doc. 1. They assert that the subdistricts drawn in districts 4 and 9 as a part of the State's 2021 redistricting plan are unlawful racial gerrymanders that violate the Equal Protection Clause of the Fourteenth Amendment. Id. The boundary of subdistrict 4A generally tracks the boundaries of the Fort Berthold Indian Reservation, and the boundary of subdistrict 9A contains the entirety of the Turtle Mountain Indian Reservation. Id. Walen and Henderson initially moved for a preliminary injunction. Doc. 12. That motion was denied. Doc. 37. All parties now move for summary judgment on the sole Equal Protection claim.

### A.    **History of the State of North Dakota's 2021 Redistricting Plan**

Article IV, Section 2 of the North Dakota Constitution requires the state legislature (the "Legislative Assembly") to redraw the district boundaries of each legislative district following the census. Each district must be represented by one senator and two representatives. N.D. Const. art. IV, § 2. A reapportionment plan "may provide for the election of senators at large and representatives at large or from subdistricts from those districts." Id.; N.D. Cent. Code § 54-03-01.5(2). Since 2001, the ratified plans have divided the state into 47 legislative districts, with one senator and two representatives elected at-large from each district. See Doc. 21-1 at 13-14.

On April 21, 2021, Governor Burgum signed House Bill 1397, which created a legislative management redistricting committee (the "Redistricting Committee"), which was tasked with developing and submitting a redistricting plan and legislation to implement the plan. Members of the Redistricting Committee included eight House of Representative members, including the

2

Chairman, Representative William Devlin, and eight Senators, including the Vice Chairman, Senator Raymon Holmberg. H.B. 1397, 67th Leg., Reg. Sess. (N.D. 2021).

**B.    The Work of the Redistricting Committee**

On October 29, 2021, after the release of the 2020 census data,[1] Governor Burgum issued Executive Order 2021-17. Doc. 19-2. That Executive Order convened a special session of the Legislative Assembly for the purposes of "redistricting of government." Id. The Redistricting Committee held its first meeting in late July 2021 and began substantive meetings two weeks after receiving the census data. Docs. 20-1, 20-2. The Tribal and State Relations Committee also began having meetings related to redistricting. Doc. 109-13.

On August 26, 2021, the Redistricting Committee heard several presentations addressing compliance with the Voting Rights Act of 1965, 42 U.S.C. § 1973 (the "VRA"), and the role that subdistricts can play in complying with the VRA. Doc. 100-1. In one presentation, there was discussion that the State could face VRA litigation if it did not create subdistricts for certain Native American reservations, including the Fort Berthold Indian Reservation and MHA Tribe (as to district 4) and the Turtle Mountain Band of Chippewa Indians Reservation (as to district 9). Id. at 31-34, 38-40, 127-128. Subdistricts were also discussed at the September 8, 2021, Redistricting Committee meeting. Doc. 100-2. A significant part of that meeting was dedicated to discussion of potential subdistricts around the Native American Reservations. Id. at 94-113.

At the next Redistricting Committee meeting on September 15, 2021, it was emphasized by Senator Holmberg, as Vice Chairman of the Redistricting Committee, that the Legislative Assembly is "very sensitive to our duties under the Voting Rights Act." Doc. 100-3 at 64-65. A

---

[1] The results were delayed over four months due to the COVID-19 pandemic. See 13 U.S.C. § 141(c).

few days later, there was another Redistricting Committee meeting. Doc. 100-4. At this meeting, Claire Ness, who was at the time an attorney with the North Dakota Legislative Counsel, gave a presentation regarding compliance with the VRA; she noted that it was acceptable to use race as a predominant factor in redistricting when doing so satisfies strict scrutiny. Id. at 9-12. There was considerable discussion at this meeting as to how the Legislative Assembly could comply with the VRA in drawing districts that would contain Native American Reservations. Id. at 14-32.  The next day, at another Redistricting Committee meeting, Senator Holmberg noted his preference to create subdistricts for Native American Reservations, assuming the appropriate population thresholds were met. Doc. 100-5 at 47-49.

In addition to receiving testimony as to the VRA and compliance with the VRA, over the course of its meetings the Redistricting Committee also received testimony encouraging the Legislative Assembly to consider communities of interest, protection of incumbents, respect for political boundaries of the tribes, compactness, and division of counties in its redistricting plan. See Docs. 20-5, 20-6, 20-8, 20-13, 20-14, 20-15, 20-16, 20-20, 20-26.

### C.     The Redistricting Committee's Decision to Draw Subdistricts

At the September 28, 2021, meeting (Doc. 100-6), the Redistricting Committee engaged in lengthy discussion and analysis about drawing subdistricts in districts 4 and 9. Senator Holmberg noted that, in years past, the low Native American population could not support subdistricts, but the recent census numbers showed the two Native American populations now met the required threshold. Id. at 21-22. To comply with the VRA and avoid a Section 2 voter dilution claim from Native American voters, Senator Holmberg moved that the Redistricting Committee draw subdistricts around the Turtle Mountain and Fort Berthold Reservations. Id. at 22. The Redistricting Committee held their final substantive meeting the next day (Doc. 100-7), and the

4

meeting concluded with the Redistricting Committee approving the subdistricts in districts 4 and

9. Visually, House District 4A tracks the boundaries of the Fort Berthold Indian Reservation:



Doc. 106-4 at 2. House District 9A contains the entirety of the Turtle Mountain Indian Reservation:



Doc. 106-4 at 4.

### D.     Passage of the 2021 Redistricting Plan

On November 9, 2021, a special House of Representatives session convened to consider the Redistricting Committee's final redistricting plan and report. Doc. 100-8. At this session, Representative Devlin, as Chairman of the Committee, explained to the House that the subdistricts were required by the VRA. Id. at 17-18. After further discussion, the House voted to approve the subdistricts (id. at 62) and the redistricting plan (id. at 81-82) and moved the redistricting plan to the Senate. The Senate debated passage of the redistricting plan on November 10, 2021. Doc. 100-9. The redistricting plan passed (id. at 50), and Governor Burgum signed the plan into law. H.B. 1504, 67th Leg., Spec. Sess. (N.D. 2021).

## III.    LAW AND ANALYSIS

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" Dick v. Dickinson State Univ., 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting Anderson, 477 U.S. at 248).

At summary judgment, the non-movant bears an affirmative burden "to go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.'" Commercial Union Ins. Co. v. Schmidt, 967 F.2d 270, 271 (8th Cir. 1992) (quoting Robinson v. Monaghan, 864 F.2d 622, 624 (8th Cir. 1989)). "The evidence of the non-movant is

6

to be believed, and all justifiable inferences are to be drawn in his favor." <u>Anderson</u>, 477 U.S. at 255.

### A.    Subject Matter Jurisdiction and Standing

To start, we address the jurisdictional issue raised by the State and the MHA Tribe—whether Walen and Henderson have standing to challenge subdistricts. Walen and Henderson argue they have standing because they each reside in an allegedly racially gerrymandered voting district.

Article III of the United States Constitution limits the subject matter jurisdiction of federal courts to "cases" and "controversies." U.S. Const. art. III, § 2. This jurisdictional limitation requires every plaintiff to demonstrate it has standing when bringing an action in federal court. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992). "It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." <u>Warth v. Seldin</u>, 422 U.S. 490, 518 (1975). The essence of standing is whether the party invoking federal jurisdiction is entitled to have the court decide the merits of the dispute. <u>Id.</u> at 498.

"[T]he irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an 'injury in fact' . . . Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant' . . . Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" <u>Sierra Club v. Robertson</u>, 28 F.3d 753, 757-58 (8th Cir. 1994) (quoting <u>Lujan</u>, 504 U.S. at 560-61).

To show an injury-in-fact, a plaintiff must show "an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual and imminent, not conjectural or

hypothetical." Id. Merely alleging an injury related to some cognizable interest is not enough; rather, a plaintiff "must make an adequate showing that the injury is actual or certain to ensue." Id.  If a plaintiff lacks Article III standing, a federal court has no subject-matter jurisdiction over the claim and the action must be dismissed. Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist., 813 F.3d 1124, 1128 (8th Cir. 2016).

### 1.   Walen and Subdistrict 4A

Standing is easily resolved as to Walen. While the State and MHA Tribe argue neither Walen nor Henderson has an injury in fact as to subdistrict 4A, it is well-settled law that a plaintiff residing in an allegedly aggrieved voting district "has standing to challenge the legislation which created that district." Shaw v. Hunt, 517 U.S. 899, 904 (1996); see also United States v. Hays, 515 U.S. 737, 745-47 (1995). It is undisputed that Walen lives in subdistrict 4A of district 4. That is sufficient to have standing to challenge the creation of the district (or subdistrict) as a racial gerrymander. The injury in fact for an individual residing in a racially gerrymandered district is the denial of equal treatment because of the legislature's reliance on racial criteria. Hays, 515 U.S. at 745. Here, that harm is fairly (and directly) traceable to the State.

The harm is also redressable. Although the State suggests the relief requested (elimination of the subdistricts at issue) cannot be granted, we disagree. When a plaintiff's injury is being placed in a racially gerrymandered district, a district court's remedy is ensuring these plaintiffs are prevented from "voting in racially gerrymandered legislative districts." North Carolina v. Covington, 138 S. Ct. 2548, 2554, (2018) (finding an equal protection violation and not allowing the State of North Carolina an opportunity to redraw its electoral map). It is within this Court's power to remedy an Equal Protection violation. Walen has standing to challenge subdistrict 4A.

2.      **Henderson and Subdistrict 9A**

Standing is a closer call as to Henderson and subdistrict 9A. Henderson resides in district 9[2] and subdistrict 9B—but subdistrict 9A is the subdistrict alleged to have been racially drawn to favor Native American voters (and the Turtle Mountain Band of Chippewa Indians specifically). The State argues this is fatal to Henderson's claim.

The Supreme Court has consistently rejected standing to bring equal protection claims by individuals who do not reside in the alleged racially gerrymandered district. Sinkfield v. Kelley, 531 U.S. 28, 30-31 (2000). Generally, "a voter has standing to bring a racial-gerrymandering claim only if he votes in a gerrymandered district, or if specific evidence demonstrates that he has suffered the special harms that attend racial gerrymandering." Alabama Legislative Black Caucus v. Alabama, 575 U.S. 254, 283 (2015) (Scalia, J., dissenting) (citing Hays, 515 U.S. at 744-745). But "[a]ny citizen able to demonstrate that he or she, personally, has been injured by [race-based redistricting] has standing to challenge the classification in federal court." Hays, 515 U.S. at 744.

Henderson alleges he is being deprived of a preferred representative because of the unlawful racial gerrymander eliminating the at-large election of House Representatives in district 9. Doc. 1 at 7. Being denied a preferred state representative as the result of a subdistrict would not be a redressable injury because it is a purely political question. See Petteway v. Galveston Cnty., No. 3:22-cv-57, 2023 WL 2782704, at *3 (S.D. Tex. Mar. 30, 2023). But being denied a preferred state representative because of an unlawful racial gerrymander, as Henderson alleges, is a concrete and particularized harm sufficient to establish standing to challenge the drawing of the subdistrict in district 9. Henderson has standing to challenge subdistrict 9A.

---

[2] Walen and Henderson do challenge subdistricts 4A, 4B, 9A, and 9B. Doc. 1 at 9.

B.      **Equal Protection Claim**

With standing resolved, we turn to the merits of Walen's and Henderson's single claim—the Equal Protection violation. The Equal Protection Clause of the Fourteenth Amendment limits racial gerrymanders in legislative districting plans. It prevents a state, in the absence of "sufficient justification," from "separating its citizens into different voting districts on the basis of race." Bethune-Hill v. Virginia State Bd. of Elections, 580 U.S. 178, 187 (2017). To show an equal protection violation in the context of redistricting, a plaintiff must satisfy a two-prong test. First, the plaintiff must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." Miller v. Johnson, 515 U.S. 900, 916 (1995). That requires demonstrating that the legislature "subordinated" other factors—compactness, respect for political subdivisions, partisan advantage—to "racial considerations." Cooper v. Harris, 581 U.S. 285, 291 (2017). That can be shown through "direct evidence" of legislative intent, "circumstantial evidence of a district's shape and demographics," or a mix of both. Id. Second, if racial considerations predominated, the design of the district must withstand strict scrutiny. Id. at 292. The burden then shifts to the state to prove that its race-based sorting of voters serves a "compelling interest" and is "narrowly tailored" to that end. Id. The Supreme Court has long held that compliance with the VRA is a compelling interest. See Shaw, 517 U.S. at 915.

1.      **Prong 1—Whether Race Predominated**

Walen and Henderson argue that race was the predominant factor motivating the Legislative Assembly's decision to draw subdistricts in districts 4 and 9. More specifically, their position is that the sole motivating factor for drawing the subdistricts was compliance with the VRA as to Native American voters. The State and the MHA Tribe disagree and point to evidence

10

in the record that race, while an important factor for assessing VRA compliance, was not the predominant factor motivating the decision to draw the subdistricts.

To succeed on a racial gerrymandering claim, a plaintiff must establish that race was not "simply . . . 'a motivation for the drawing of a majority-minority district,' but 'the predominant factor.'" Easley v. Cromartie, 532 U.S. 234, 241 (2001) (quoting Bush v. Vera, 517 U.S. 952, 959 (1996). That burden is a heavy one, and a plaintiff must show that race is the only explanation for why the offending districts were drawn. Id. at 241-42 (the creation of the challenged district(s) must be unexplainable on grounds other than race); Miller, 515 U.S. at 916 (the legislature must have "subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations.").

The record contains ample evidence that VRA compliance and avoiding litigation from Native American voters was a motivating factor in the decision to draw the subdistricts. During the floor debate in the Senate on the final redistricting plan, Senator Holmberg explained, "We followed the best we could with the Voting Rights Act." Doc. 100-9 at 6. Indeed, VRA compliance as to Native American vote and population was discussed at nearly every Redistricting Committee meeting. See Doc.103-5; Doc. 103-15; Doc. 104-8; Doc. 104-16. The Redistricting Committee also reviewed a redistricting memorandum from North Dakota Legislative Council that provided guidance on redistricting and VRA compliance. Doc. 109-1.

That said, while VRA compliance and race were important factors in the decision to draw the subdistricts, the record also shows the Redistricting Committee considered traditional race-neutral districting principles. For example, Executive Director of North Dakota Native Vote Nicole Donaghy offered written testimony as to the importance of preserving communities of interest.

11

Doc. 20-3. North Dakota Farmers Union Representative Matt Perdue provided written testimony about the importance of following traditional redistricting criteria, including division of counties, and encouraged subdistricts for mixed urban and rural representation. Doc. 20-7. Mark Fox, Chairman of the Tribal Business Council of the MHA Tribe, also gave written testimony about the need to preserve communities of interest and the political subdivision of the MHA Tribe. Doc. 20-18. The record confirms that the Redistricting Committee considered communities of interest, protection of incumbents, respect for political boundaries of the tribes, compactness, and division of counties. See generally Docs. 20-5, 20-6, 20-8, 20-13, 20-14, 20-15, 20-16, 20-20, and 20-26. So, while there is evidence that the Legislative Assembly drew the subdistricts to avoid a VRA lawsuit from Native American voters, there is also evidence that other factors were considered.

The conflicting views of the evidence present a fact question as to whether race was the predominant motivating factor for the Legislative Assembly's decision to draw subdistricts in districts 4 and 9. Accepting each nonmovants factual allegations as true, see TCF Nat'l Bank, 812 F.3d at 707, there is a genuine issue of material fact as to whether race was the predominate motivating factor in the Legislative Assembly's decision to draw the subdistricts.

## 2.      Prong 2—Strict Scrutiny

That does not end our analysis though. Assuming without deciding that race was the predominate motivating factor for the decision to draw the subdistricts, the second prong of the analysis requires the State to show its actions satisfy strict scrutiny. Walen and Henderson argue the State's actions cannot meet strict scrutiny because the Legislative Assembly did not "prove" the Gingles preconditions before deciding to draw the subdistricts, so the Legislative Assembly could not have known the subdistricts were required to comply with the VRA. The State and the

MHA Tribe argue the State had good reasons and a strong basis in evidence to believe the subdistricts were demanded by the VRA.

If race is found to have predominated the creation of a district, the burden shifts to the state to prove that its race-based sorting of voters serves a "compelling interest" and is "narrowly tailored" to that end. Cooper, 581 U.S. at 292. As stated earlier, one compelling interest is complying with the VRA. See id.; see also Shaw, 517 U.S. at 915; Wisconsin Legislature v. Wisconsin Elections Comm'n, 142 S. Ct. 1245, 1250 (2022).  But when a state invokes the VRA to justify race-based districting (as the State has here):

> [I]t must show (to meet the "narrow tailoring" requirement) that it had "a strong basis in evidence" for concluding that the statute required its action. Or said otherwise, the State must establish that it had "good reasons" to think that it would transgress the Act if it did not draw race-based district lines. That "strong basis" (or "good reasons") standard gives States "breathing room" to adopt reasonable compliance measures that may prove, in perfect hindsight, not to have been needed.

Cooper, 581 U.S. at 292 (cleaned up). This means the State can satisfy strict scrutiny by showing it had good reasons and a strong basis in evidence to believe the subdistricts were required under the VRA.

### a.      Whether the State had good reasons and a strong basis to believe the subdistricts were required by the VRA

Turning to that question, Walen's and Henderson's position is that the State cannot show it had good reasons and a strong basis in evidence to believe the subdistricts were required by the VRA because the Legislative Assembly did not conduct a pre-enactment Gingles analysis to determine if Native American voters would have a viable Section 2 claim under the VRA without the subdistricts.  The State and the MHA Tribe disagree and argue there was much evidence before the Legislative Assembly that the subdistricts were needed to satisfy the VRA and avoid voter dilution claims. We agree with the State and the MHA Tribe.

13

We start with Walen's and Henderson's position that the State was required to "prove" the Gingles preconditions to have a strong basis in evidence to believe the VRA required the subdistricts. In support, they rely on Cooper, 581 at 285, and Wisconsin Legislature, 142 S.Ct. at 1245. They cite this quotation from Cooper: "To have a strong basis in evidence to conclude that § 2 demands such race-based steps, the State must carefully evaluate whether a plaintiff could establish the Gingles preconditions—including effective white bloc-voting—in a new district created without those measures." 581 U.S. at 304. In Thornburg v. Gingles, 487 U.S. 30 (1986), the United States Supreme Court articulated the three preconditions a plaintiff must satisfy before proceeding with a voter dilution claim under Section 2 of the VRA. Those preconditions are:

1.    The minority group . . . is sufficiently large and geographically compact to constitute a majority in a single-member district;

2.    The minority group . . . is politically cohesive; and,

3.    The white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances . . . to defeat the minority's preferred candidate.

Id. at 50-51.

Nothing in the case law from the United States Supreme Court requires a state legislative body to prove the Gingles preconditions in order to have good reasons and a strong basis in evidence to believe the VRA required a particular district. To be sure, the case law does require a state legislative body to consider more than population numbers or election returns in isolation. See Abbott v. Perez, 138 S. Ct. 2305, 2321-32, 2334 (2018).  As Cooper explicitly instructs, states must "carefully evaluate" whether the Gingles preconditions could be met by a challenging plaintiff—but that is not the same as requiring a state legislative body to preemptively prove (as Walen and Henderson argue) the preconditions as to a new district. Indeed, Cooper also states, "If a State has good reason to think that all the Gingles preconditions are met, then so too it has good

14

reason to believe [the VRA] requires" the new district. 581 U.S. at 301 (emphasis added). Application of the standard articulated in Cooper is much different from requiring proof. Requiring proof of the Gingles preconditions pre-enactment would seem to eliminate the "breathing room" given to states in adopting VRA compliance measures.

We find Abbott, 138 S.Ct. at 2305, particularly instructive on that point. Abbott followed Cooper, and the decision provides the framework for assessing what pre-enactment evidence a state must consider in order to have good reasons and a strong basis in evidence to draw race-based district lines in compliance with the VRA. In Abbott, the Supreme Court determined that consideration of election returns standing alone, while suggestive, is not sufficient to establish good reasons. 138 S.Ct. at 2334. It also noted that, in Cooper, expert reports on voting patterns throughout North Carolina were insufficient to establish good reasons. Id. at 2335. Then it reviewed its decision in Bethune-Hill, where it accepted the state's good reasons for drawing race-based district lines. In that case, the state established it considered turnout rates, population numbers, and results of recent elections in deciding to draw certain district lines. Id. Abbott explains, "[W]here we have accepted a State's 'good reasons' for using race in drawing district lines, the State made a strong showing of a pre-enactment analysis with justifiable conclusions." Id. Said another way, while a state is not required to prove the Gingles preconditions, it must carefully engage in a pre-enactment analysis of the same to show it had good reasons and a strong basis in evidence to believe the district was required by the VRA.

Wisconsin Legislature, 142 S.Ct. at 1245, supports that standard. In that case, the Wisconsin Supreme Court chose the Governor's proposed legislative redistricting map over maps drawn by the Wisconsin Legislature. Id. at 1247. The Legislature objected to the inclusion of a seventh majority-minority district and sought emergency relief from the Supreme Court, alleging

that the Governor's plan violated the Equal Protection Clause because it drew race-based maps without sufficient justification. Id.

The Supreme Court decided the Wisconsin Supreme Court's analysis was flawed because it had only examined whether there were good reasons to believe the VRA may support the district, instead of whether there were good reasons to believe the VRA demanded the district. Id. at 1249. The Supreme Court explained that, when a state invokes the VRA to justify race-based districting, "it must show that is had a strong basis in evidence for concluding that the statute required its action." Id. at 1250 (citing Cooper, 581 U.S. at 301). It also emphasized that the "breathing room" for reasonable mistakes "does not allow a State to adopt a racial gerrymander that the State does not, at the time of imposition, 'judge necessary under a proper interpretation of the VRA.'" Id. To the extent the decision addresses the Gingles preconditions directly, the decision noted a lack of evidence and analysis to support drawing the at-issue district. Id. Nothing in Wisconsin Legislature demands that a state legislative body prove the Gingles preconditions prior to drawing legislative districts—rather, it confirms that a state must carefully engage in a pre-enactment analysis of the preconditions to show it had good reasons and a strong basis in evidence to believe the district was required by the VRA.

With that standard in mind, we turn to the undisputed legislative record to assess the State's pre-enactment analysis. While the Redistricting Committee was meeting, many Native Americans advocated for the subdistricts. Executive Director of North Dakota Native Vote Nicole Donaghy submitted written testimony on the growth of the Native American population in North Dakota and noted the failure of Native American candidates of choice around her district and statewide. Doc. 104-1. She also discussed the potential of a voter dilution claim without a subdistrict. Id. Spirit Lake Tribal member and Gaming Commission Executive Director Collette Brown also

offered written testimony to the Redistricting Committee. Doc. 104-2. She urged the Legislative Assembly to move away from at-large districts around reservations because of their "dilutive effect." Id. Brown also testified that Native American voters and white voters in North Dakota tend to vote for different candidates. Id.

The Redistricting Committee heard from the leaders of the MHA Nation, Standing Rock Tribe, and Spirit Lake Tribe. Mark Fox, Chairman of the Tribal Business Council of the MHA Tribe, offered written testimony as to the subdistrict in district 4. Doc. 109-14. Among many things, he testified as to each of the Gingles preconditions and how the preconditions for a Native American voter dilution claim would be met in district 4 without the subdistrict. Id. Mike Faith, Chairman of the Standing Rock Sioux Tribe, provided written testimony about Native American population growth, the need to move away from at-large districts to satisfy the VRA, and the differences in voter preference between Native Americans and white voters. Doc. 104-3. Charles Walker, a Councilman for the Standing Rock Sioux Tribe, also discussed the significant Native American population growth in North Dakota, the need for subdistricts, and the divide regarding candidates of choice for Native Americans and white voters. Doc. 104-4.

Also relevant is the Redistricting Committee's final report to the Legislative Assembly. Doc. 104-14 at 19-30. This report detailed the requirements of the VRA and described the Gingles preconditions for Section 2 claims. Id. at 27. The report also discussed the population growth of Native American tribes, the prevalence of racially polarized voting, the lack of success of Native American preferred candidates, as well as the need for subdistricts in districts 4 and 9 to comply with the VRA. Id. at 29. It also notes that the Redistricting Committee received updates from the Tribal and State Relations Committee. Id. We find the following paragraphs important:

17

The committee reviewed the 2020 Census data for tribal reservations, including the total population, total voting-age population, American Indian population, and American Indian voting-age population for each of the five reservations in North Dakota. ("American Indian" is the official United States Census Bureau designation for Native Americans.) Committee members noted the American Indian populations on the Fort Berthold Reservation and Turtle Mountain Reservation exceeded 4,145, the number required to constitute a majority of a House subdistrict with the ideal population size of 8,288. According to the Census Bureau, 5,537 American Indians live on the Fort Berthold Reservation, and 4,767 American Indians live on the Turtle Mountain Reservation. The numbers of American Indians on the Spirit Lake Reservation and the North Dakota portions of the Lake Traverse Reservation and Standing Rock Reservation are 3,134,56, and 3,332, respectively.

The committee received information from the Legislative Council staff and testimony from others on constitutional and statutory provisions regarding the use of race in redistricting. In particular, the committee received detailed testimony and information regarding the 14th Amendment, the federal Voting Rights Act, and caselaw applying them to multimember and single-member districts. The testimony and information included in-depth discussions of the *Gingles* preconditions and the circumstances under which majority-minority districts or subdistricts are required under federal law. The committee also received information regarding *Grinnell v. Sinner*, a case in which Native Americans sued Governor George Sinner and other officials alleging the Voting Rights Act required North Dakota's 1991 redistricting plan to include a subdistrict for Native Americans in District 4. The plaintiffs lost the case because they were unable to meet the first *Gingles* precondition based on the Native American population in District 4 in the 1990 Census. According to the Census Bureau, 2,999 Native Americans lived on the Fort Berthold Reservation in 1990. The ideal district population for North Dakota based on the 1990 Census was 13,037, and the ideal subdistrict population was 6,518. The committee also received information regarding the creation of two Native American-majority subdistricts in South Dakota and the litigation concerning the subdistricts.

The committee engaged in several discussions regarding subdistricts. Some committee members expressed discomfort with drawing subdistrict boundaries based on race, a preference for court-directed subdistricts over legislatively initiated subdistricts, and concerns about having most citizens vote for two members of the House of Representatives while citizens residing in subdistricts vote for only one representative. Other committee members noted the creation of subdistricts might prevent a possible dilution of Native Americans' votes, provide communities of interest an opportunity to select their candidates of choice, and potentially stave off a court challenge to the redistricting map for which the committee had worked in an honest and transparent manner. Some committee members expressed a preference for legislatively drawn district boundaries over court-drawn boundaries that may result from litigation.

18

Id. at 29-30. The report shows the Redistricting Committee considered possible voter dilution claims under Section 2 by Native American voters and whether Native American voters would be able to satisfy the Gingles preconditions without the subdistricts. This is sufficient pre-enactment analysis to establish it had good reasons to believe the subdistricts were required by the VRA.

Beyond the Redistricting Committee's final report, the Legislative Assembly also heard evidence from individual Representatives, who testified about why the VRA required subdistricts. House Representative Chet Pollert, a member of the Tribal and State Relations Committee, encouraged the passage of the redistricting plan and noted the subdistricts were needed because, "[W]e have that population base in those two districts and those two districts to have the subdistricts. So I would ask the House chambers to vote in favor of what the committee chairman brought forward and what the redistricting did. And let's move on." Doc. 100-8 at 53-54. Representative Devlin also testified about the need for the subdistricts in a floor debate. Doc. 100-8 at 18-20. He specifically explained that districts 4 and 9 now have sufficient population to successfully bring a Section 2 claim if the subdistricts were not drawn. Id. House Representative Austen Shauer also encouraged passage of the redistricting bill with the subdistricts to comply with the VRA. Id. at 10-11. Others testified about the polarization and lack of success for Native American preferred candidates. House Representative Mike Nathe stated the House had received "plenty of testimony" about Native American candidates not having an opportunity to win at-large districts. Doc. 100-8 at 45-46.

During the Senate debate, Senator Holmberg stressed that the changes in population meant the subdistricts were necessary to comply with the VRA. Doc. 100-9 at 3-7. Senator Jordan

Kannianen[3] also discussed racial polarization and the fact that the Native Americans and white voters tend to vote for different candidates. Doc. 100-9 at 29-30.

The undisputed record shows the Legislative Assembly did perform a contemplative and thorough pre-enactment analysis as to whether the subdistricts were required by the VRA and whether Native American voters would have a viable Section 2 claim without the subdistricts. While the State did not "prove" the Gingles preconditions as to the subdistricts, it was not required to do so. But the State did "carefully examine" potential Section 2 claims and conducted a pre-enactment analysis of the same. That included reviewing testimony and presentations as to the Gingles preconditions. The record is undisputed, and there are no genuine issues of material fact. So, as a matter of law, even assuming race was the predominate motivating factor, we find that the State's decision to draw subdistricts in districts 4 and 9 is narrowly tailored to the compelling interest of compliance with the VRA.

While not necessarily dispositive of the Equal Protection claim, the State and the MHA Tribe also offer compelling and unrefuted evidence that as to district 4, without the subdistrict, Native American voters would in fact have a viable Section 2 voter dilution claim under the VRA.[4] Taking that unopposed evidence as true, granting Walen and Henderson the relief they seek as to district 4—eliminating the subdistrict—would be itself a violation of the VRA and federal law. This is further evidence that, at least as to district 4, drawing the subdistrict is narrowly tailored to the State's compelling interest in complying with the VRA.

---

[3] Senator Kannianen opposed the subdistricts.

[4] There is an active Section 2 claim against the State as to district 9. See Turtle Mountain Band of Chippewa Indians, et al. v. Howe, Case No. 3:22-cv-22 (D.N.D.).

To conclude, assuming without deciding that race was the predominate motivating factor in the Legislative Assembly's decision to draw the subdistricts in districts 4 and 9, the State had good reasons and strong evidence to believe the subdistricts were required by the VRA. Thus, we conclude the subdistricts are narrowly tailored to the State's compelling interest in complying with the VRA.

## V.    <u>CONCLUSION</u>

We have reviewed the record, the parties' filings, and the relevant legal authority. For the reasons above, Walen's and Henderson's motion for summary judgment (Doc. 98) is **DENIED**, and the State's (Doc. 101) and the MHA Tribe's (Doc. 107) motions for summary judgment are **GRANTED**. Given the extensive briefing and undisputed legislative record, Walen's and Henderson's motion for oral argument (Doc. 120) is also **DENIED**.

**IT IS SO ORDERED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated this 2nd day of November, 2023.

*/s/ Peter D. Welte*
Peter D. Welte, Chief Judge
United States District Court

*/s/ Ralph R. Erickson*
Ralph R. Erickson, Circuit Judge
Eighth Circuit Court of Appeals

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court